**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 18, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MICHAEL DELOZIER,

         Petitioner - Appellant,

    v.

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

         Respondent - Appellee.

No. 06-7107

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 00-CV-102-JHP-KEW)**

Jack S. Dawson (Sarah M. Jernigan with him on the brief), of Miller Dollarhide,
Oklahoma City, Oklahoma, for Petitioner - Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for Respondent - Appellee.

Before **LUCERO**, **MURPHY**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Michael DeLozier was convicted on two counts of first-degree murder in

Oklahoma state court and sentenced to death. The Oklahoma Court of Criminal

Appeals (OCCA) affirmed the conviction and sentence. *See DeLozier v. State*, 991 P.2d 22 (Okla. Crim. App. 1998). After Mr. DeLozier filed an unsuccessful petition for a writ of certiorari in the United States Supreme Court, *see DeLozier v. Oklahoma*, 528 U.S. 1023 (1999), and an unsuccessful application for postconviction relief in Oklahoma state court, he filed in the United States District Court for the Eastern District of Oklahoma on August 31, 2000, an application for relief under 28 U.S.C. § 2254. The district court denied the application but granted a certificate of appealability (COA) on Mr. DeLozier's claim of ineffective assistance of counsel. *See* 28 U.S.C. § 2253(c)(1) (requiring a COA to appeal denial of habeas application). We denied Mr. DeLozier's motion for issuance of an expanded COA.

The OCCA summarized the incriminating evidence as follows:

Steven Morgan and Orville Lewis Bullard were camping in a converted step-van on the bank of the Glover River in northern McCurtain County [the "Morgan camp"]. About 600 yards from their campsite was the "Tate bus," a bus also converted for camping. DeLozier, Glenney Dale ["Bo"] Madison, Nathaniel Brandon Madison, and others were staying at the bus. Sometime on Saturday, September 23, 1995, DeLozier, the Madison [cousins] and James ["Bubba"] Oliver happened upon the Morgan campsite. They engaged in conversation for a few minutes.

While there DeLozier spotted a generator he thought would bring about $700 if stolen. Once back at the Tate bus, DeLozier mentioned stealing the generator. Several of the group, including DeLozier, talked about killing Morgan and Bullard and stealing everything they had.

That night, DeLozier, carrying a single shot shotgun, Glenney Madison, carrying a .22 caliber rifle, and Nathaniel Madison, set off for the Morgan site. Once there, according to Nathaniel Madison, DeLozier stepped into the camper and fired a single shot toward the rear with the shotgun. Then Glenney Madison stepped into the camper and fired a shot from the .22 rifle. The group then stood near Morgan's pickup where Glenney Madison fired several shots into the front of the camper. Nathaniel Madison shouted several times for the camper's occupants to come out, saying nothing would happen to them.

After several minutes, Morgan stepped from the camper. Upon doing so, DeLozier shot him once in the chest with the shotgun. DeLozier and Glenney Madison approached Morgan, and DeLozier took the rifle from Glenney and fired it once into Morgan's face.

The three loaded the generator and many other items from the campsite, some of which were taken from the camper, into Morgan's pickup and took the stolen items back to the Tate bus. On the final trip back to the Morgan camper, the trio encountered headlights coming from the Morgan camp site. All three bailed out from the pickup and left it sitting in the road.

George Vance was driving the vehicle which frightened the trio. He drove up on the Morgan camper and observed Morgan lying on the ground with his pants in his hands. Upon seeing this he turned around and got out as fast as he could. On his way out he found that he was blocked by Morgan's abandoned pickup. He got out of his vehicle and moved Morgan's pickup to the side of the road.

Morgan was found lying on his back outside the camper in front of the door. His body had been burned. Morgan's camper had been burned with the body of Bullard still lying in his bed. Morgan's pickup had also been burned.

*DeLozier*, 991 P.2d at 25–26.

Mr. DeLozier, Bo Madison, and Nathaniel Madison were charged with the first-degree murders of Bullard and Morgan. Bo Madison was convicted and

-3-

sentenced to life without parole in a separate proceeding. Nathaniel Madison entered into a plea agreement with the State, agreeing to testify against Mr. DeLozier in exchange for a lesser charge and reduced sentence.

On appeal Mr. DeLozier challenges his conviction and sentence on the grounds that his trial counsel was ineffective in (1) not properly challenging four jurors who were biased in favor of the death penalty; (2) not moving before trial to exclude evidence of his prior convictions; (3) not calling as witnesses his sister and a friend who were with him shortly after the murders but who did not participate in the murders; (4) not effectively impeaching Nathaniel Madison's testimony; (5) not objecting to the State's improper comment on his pretrial silence; (6) not objecting to the State's improper questions when he was cross-examined and to its improper arguments to the jury; and (7) not conducting a proper investigation to obtain mitigating evidence for the penalty phase of trial and not presenting available mitigating evidence. He also contends (8) that his counsel on direct appeal to the OCCA was ineffective for not raising a claim of ineffective trial counsel and (9) that the cumulative effect of trial counsel's deficient acts rendered counsel's assistance ineffective. We affirm.

## I.     THE TRIAL

### A.     Jury Selection

During voir dire the trial court informed each potential juror that under Oklahoma law there were three alternative punishments for a person convicted of

-4-

first-degree murder: death, imprisonment for life with no parole, or imprisonment for life. It asked the jurors whether they could fairly consider each alternative if the defendant was found guilty.

Four prospective jurors initially indicated that they would have difficulty considering sentences other than death. The trial court inquired further into whether they could fairly consider all three forms of punishment, and then permitted the parties to ask questions. Ultimately, each of the four said that they could give fair consideration to each form of punishment. Mr. DeLozier's attorney challenged only one of the prospective jurors for cause, but the court overruled his challenge. He then removed that prospective juror and another of the four with peremptory strikes; the other two jurors sat on the jury.

## B. The Guilt Phase

### 1. The Prosecution's Case in Chief

#### a. Nathaniel Madison

Nathaniel Madison was the first witness. He testified as follows: In late September 1995 Damon Tate drove Mr. DeLozier, Bo Madison, Bubba Oliver, Paradise Wooten, and him to a campsite on the Glover river that they called "the Tate bus" because of a bus on the site that had been converted for camping. The next day they all smoked marijuana but were not high because the marijuana was not good. In the afternoon Mr. DeLozier, Bo, Bubba, and he left the camp on four wheelers to look for a generator that they had heard the previous night; they

had agreed to steal it. They found the generator at the Morgan camp, where they saw Morgan and Bullard and stopped to talk. Nathaniel noticed the generator, ice chests, and various other camping equipment.

When they returned to the Tate bus, Mr. DeLozier again brought up the idea of stealing the generator. Nathaniel, Bo, and Bubba thought that it was a good idea. As they were sitting around a campfire that evening, Mr. DeLozier suggested that they just shoot the men and take everything that they had. Bo and Nathaniel, but not Bubba, agreed. After a discussion of 15 or 20 minutes, Bo, Nathaniel, and Mr. DeLozier decided to lie down, intending to wait a while so that the victims would be asleep when they arrived at the Morgan camp. Later they noticed that the generator had stopped running, so the three men walked to the Morgan camp through the woods. Mr. DeLozier carried a shotgun and Bo carried a .22 caliber rifle.

Upon arriving at the campsite, Mr. DeLozier and Bo each stepped into the camper, fired a shot toward the back of the camper, and then hid behind a pickup at the site (Morgan's pickup). From there, Bo fired additional shots into the camper. As instructed by Mr. DeLozier, Nathaniel began yelling for the occupants to come out. About 20 minutes later Morgan came to the door of the trailer. Mr. DeLozier told him to come out, assuring him that nothing would happen to him. But when Morgan finally emerged, Mr. DeLozier stepped out

from behind the truck and shot him with the shotgun.  Mr. DeLozier then took the .22 from Bo and shot Morgan in the face.

After the shooting the three men loaded goods from the camper into Morgan's pickup and drove it back to the Tate bus.  They later returned, again filled the pickup with goods, and drove back to the Tate bus.  Among the items that they took were two automatic shotguns and a .22 rifle.  Some time after the first trip, Michelle Tate (Mr. DeLozier's sister), Damon Tate (her husband), and Shawn Smith arrived at the campsite.  Michelle asked where they had gotten the truck and the goods.  Mr. DeLozier answered that they had "borrowed the truck and . . . got the stuff at the getting place."  R. Vol. 8 at 572.

Mr. DeLozier and the Madisons later set out in the pickup on a third trip to the Morgan camp.  But they met an oncoming vehicle on their way.  Mr. DeLozier pulled the truck to the side of the road and they fled.  The Madisons went in a different direction than Mr. DeLozier did, and they never saw him again.  As the Madisons walked back to the Tate bus, about five minutes after fleeing the truck, Nathaniel saw the truck catch on fire.  Ten minutes later he saw the Morgan camper catch on fire and assumed that Mr. DeLozier had started the fires.

When Nathaniel and Bo arrived at the Tate bus, they changed clothes, grabbed the guns used in the shootings, and walked to Damon Tate's house. Damon drove them to meet Nathaniel's mother.  In exchange for the ride,

Nathaniel gave Damon the .22 used in the shooting; Nathaniel returned the shotgun to the owner, his brother Tim.

Nathaniel was arrested early the next morning. He was then interviewed by an investigator with the Oklahoma State Bureau of Investigation (OSBI), and he was interviewed again the next day. He had not yet retained an attorney nor been offered a plea agreement.

Mr. DeLozier's attorney, Robert Perrine, cross-examined Nathaniel. Although Nathaniel had testified on direct that his testimony was consistent with what he had said in both interviews with the OSBI, Perrine pursued possible inconsistencies: Nathaniel had testified that Mr. DeLozier was the one who had first spoken of killing Morgan and Bullard, but Perrine suggested that (1) in Nathaniel's initial interview he had said that there had been no talk of killing the victims before they went to the Morgan camp and (2) in the later interview he had said that Bo spoke of killing the men before their first trip to the camp. In response, Nathaniel admitted that it was possible that he had lied during his second interview. Also, although Nathaniel had testified that the murders occurred on the first trip to the Morgan camp and that he, Mr. DeLozier, and Bo were together on every trip made to the camp, Perrine intimated that Nathaniel had told OSBI agents in his first interview that Mr. DeLozier had made a trip to the camp by himself and, when he returned, told Nathaniel and Bo that he had set fire to the campsite. Nathaniel admitted that if he had said that, it was a lie.

On further cross-examination Nathaniel admitted that he and Bo, not Mr. DeLozier, had left the camp area with the murder weapons. Perrine then elicited that in return for testifying against Mr. DeLozier, Nathaniel would be charged with conspiracy to murder, rather than murder in the first degree, and his punishment would be only ten years' imprisonment and ten years' probation. Perrine also questioned Nathaniel about a letter that he had written to Paradise Wooten saying that he would lie to get even and advising her to lie under oath if she found herself in trouble. Asked whether he was capable of lying under oath, he admitted that he was.

### b. Law-Enforcement and Expert Witnesses

OSBI Agent Chris Dill confirmed that the shotgun used in the crime had been recovered from the home of Tim Madison. On cross-examination Perrine elicited that Dill had conducted the first interview of Nathaniel and that Nathaniel had made two statements contrary to his trial testimony: Dill said that Nathaniel had told him (1) that neither he, Bo, nor Mr. DeLozier had discussed killing the victims before going to the Morgan camp to steal property, and (2) that Mr. DeLozier made a trip to the Morgan camp by himself and, when he returned, said that he had burned the pickup but did not say that he had burned the camper.

OSBI Agent Dale Birchfield described the murder scene and the surrounding area, including the distance to the Tate bus—about 300 to 400 yards. Also, to rehabilitate Nathaniel's testimony, he recounted what Nathaniel had told

him during Nathaniel's second OSBI interview. In particular, Nathaniel had said that Mr. DeLozier and Bo had stepped into the camper and fired shots, that Morgan later came out of the camper, and that Mr. DeLozier had shot him first in the chest with a shotgun and then in the face with a .22. Birchfield admitted on cross-examination, however, that the OSBI investigation had shown that the Madisons, not Mr. DeLozier, had taken the two murder weapons from the Tate bus as they fled.

Dr. Ronald F. Distefano, a forensic pathologist and medical examiner, testified that Morgan's body was charred but that there was nevertheless evidence that he had been shot. X rays showed objects in the chest that were characteristic of shotgun pellets, and there was a gunshot wound in the head. Similarly, although Bullard's body was also charred, an x ray revealed shotgun pellets, the plastic wad of a shotgun shell was recovered from the body, and there was evidence of a bullet wound in the head.

Lester Blake, an agent with the Oklahoma State Fire Marshal, testified to his opinion that the fire at the Morgan camp had been intentionally set with a match and ignitable liquid. The fire followed the liquid from Morgan's body to the camper, where there was evidence of an accelerant pour pattern. Inside the camper were some items that had exploded as a result of the fire, including a gas lantern and some ammunition. On cross-examination Blake said that the fire would have reached its peak within three minutes, so that it could have been seen

from a distance, and would have continued for an hour or more; and he suggested that in addition to explosions of the lantern and ammunition, the tires may have exploded before they burned.

### c.    George Vance

George Vance did not testify but the parties stipulated to what he would have said:

> [H]e was . . . traveling in his pickup truck [when] he came upon a campsite by the Glover River and observed a white male on his back on the ground in front of a camper located at the camp.  This white male was clothed in undershorts and a shirt and was holding a pair of blue jeans to his chest.  [He] then attempted to leave the camp area and spun his tires doing so[.]  [As he] left the camp [he] met a . . . pickup, which was abandoned by its drivers[.]  [He] moved this vehicle which was blocking the roadway and left the area.  [He] saw no fires at any time that evening.

R. Vol. 9 at 810.

### d.    Michael Mussett

Michael Mussett, who had been an inmate at the McCurtain County Jail with Mr. DeLozier, testified that during an argument Mr. DeLozier yelled to another inmate, Rodney Broades:  "I've already killed two men, mother fucker; I won't hesitate to kill you."  *Id*. at 726.  Mussett explained that because he was a "trustee," he was not in a cell with the rest of the inmates, but was able to roam the jail's L-shaped hallway.  When the statement was made, he was standing at the elbow, or "pivot point" of the L, looking in both directions.  He could see Mr. DeLozier's ten-man cell (the "Thunderdome") to the right, and Broades's

seven-man cell on the hallway to the left. Broades was screaming at the door of the seven-man cell and Mr. DeLozier's face was visible through the Thunderdome's bean hole (a head-level opening in the cell door about six inches wide and 14 inches high). Mussett reported the incident to officials the following day. Although he admitted that his trustee status reduced his time to be served, he claimed to have received no special treatment for reporting the incident.

On cross-examination Mussett admitted that someone standing at the pivot point of the hall could not see into the Thunderdome and that he "wouldn't know [Mr. DeLozier's] voice from Adam." *Id*. at 730. Perrine further elicited that Mussett had known the victims all his life and knew when he went to jail that the people accused of killing them would be there. When asked whether he felt that he was helping the Morgans and Bullards by testifying, he said that he did not know.

After Mussett testified, Perrine requested that the jury be permitted to visit the jail, saying, "I went down there at lunch time and looked and . . . [t]here's no way; you can't get enough of your face in that bean hole to identify who it is." *Id*. at 770. He argued that "the defendant is entitled to have this jury go look for themselves to determine whether or not the witness Mussett is telling the truth about the way he identified the speaker of those words, because he said that was the only way he could identify them is by looking at him and seeing him through the bean hole." *Id.* The court denied the motion. Perrine later moved for

permission to call a witness to rebut Mussett's testimony.  The court granted the request, but the witness was never called.

### 2.     Mr. DeLozier's Case

Two witnesses testified for the defense:  Paradise Wooten and Mr. DeLozier himself.

### a.     Paradise Wooten

Wooten testified that she had been with Mr. DeLozier, the Madisons, and her brother, Bubba Oliver, at the Tate bus the night of the murders.  They all sat around the campfire talking about stealing stuff from the Morgan camp and killing Morgan and Bullard.  They smoked one marijuana joint that evening, but because they had no papers or cans to smoke the little marijuana that was left, they threw the remainder in the fire.

She and Bubba were asleep when Mr. DeLozier and the Madisons returned from the Morgan camp.  They woke her, but she stayed in bed and did not see the truck or what they had taken.  The three men left again; and she and Bubba stayed up to await their return.  This time, however, Mr. DeLozier returned to the campsite by himself.  He said, "Let's go, the game rangers are down there." *Id*. at 854.  She and Bubba dressed and the three of them quickly left.

Up to that point she had not heard any gunshots.  After they had traveled about 50 yards from the campsite, she saw a light coming from near the river (by the Morgan camp).  The light looked like "[l]ights on a football field but it was

yellow." *Id.* at 856. Once they finally got up the hill, about 30 to 45 minutes after leaving the campsite, she heard three or four gun shots; five minutes later she heard a blast. Wooten, Bubba, and Mr. DeLozier wandered through the mountains for three days before they were arrested. Mr. DeLozier was with her the entire time. She did not recall seeing any blood on his clothes or any evidence that he had been near a fire. And he had not acted as if he had killed somebody. On cross-examination Wooten admitted that part of the reason that she and Bubba had refused to go to the Morgan camp with the others was the earlier talk of killing Morgan and Bullard.

### b.    Mr. DeLozier

Mr. DeLozier began his testimony by stating his age (19), providing some background information, and admitting that he had previously pleaded guilty to felony charges of killing one police dog and injuring another. He then gave his account of the murders. He had gone to the Tate bus campsite to avoid appearing for court proceedings regarding the felony charges, which were pending at the time. On Saturday September 26 he, Nathaniel, Bo, and Bubba were riding four wheelers when they came across Morgan, Bullard, and a third man at the Morgan camp. After talking with the three men for 15 to 20 minutes, they left. Mr. DeLozier suggested to the others that they steal the generator from the Morgan camp. Bo and Nathaniel again mentioned stealing property from the Morgan camp later that evening as they were sitting around the campfire with

-14-

Mr. DeLozier, Wooten, and Bubba. This time, however, Bo suggested that they kill Morgan and Bullard and take everything. Mr. DeLozier did not respond because he did not think Bo was serious. They were all high on marijuana, and he had used some methamphetamine that weekend.

During the night the three left for the Morgan camp. He carried a shotgun and Bo carried a .22, but they did so only for protection. About halfway to the campsite they stopped to smoke a cigarette and he handed the shotgun to Nathaniel, who carried the gun the rest of the way.

When they arrived at the campsite, the pickup, which was backed up to the camper, was packed with camping equipment and other personal property; everything but the generator was loaded on the truck. The keys were in the truck. They quickly threw the generator in the back of the truck and left. As they were unloading the pickup at the Tate bus, Michelle Tate, Damon Tate, and Shawn Smith arrived in their vehicle. Damon said that a game warden had stopped them as they drove to the Tate bus.

After Damon, Michelle, and Shawn left, the Madisons wanted to go back to the Morgan camp for another load. Mr. DeLozier joined them. On their way back to the Morgan camp in the stolen truck, they saw headlights approaching, so they stopped the truck and fled. Mr. DeLozier went back to the Tate bus and the Madisons went in a different direction. When Mr. DeLozier reached the Tate bus about ten minutes later, he woke up Paradise and Bubba and told them that they

-15-

had to leave. He explained that he thought he had seen a game warden and assumed that they did not want to be at the bus with stolen goods stacked in front of it when the game warden arrived. As they were leaving in the opposite direction from the Morgan camp, they heard an explosion and saw an orange glow along the river. They also heard several "pops like gunshots." R. Vol. 10 at 920.

On cross-examination Mr. DeLozier testified that he had never threatened to kill fellow inmate Broades and that Mussett was lying.

### 3.  Rebuttal Witness

The State called Phyllis Morgan Setzer, Morgan's wife, in rebuttal. She testified that she and her husband had gone camping hundreds of times and had never loaded their things the night before. Rather, on the day they were set to leave, they would typically have lunch and then load everything into the truck. On the weekend of the murders, she and her son planned to drive to the Morgan camp that Sunday (the day after the murders), meet Morgan and Bullard for a fish fry, and pack up after that. She also testified that many of the items recovered from the Tate bus were items that remained permanently in the camper at the Morgan camp; they would not have taken them home.

### C.  The Penalty Phase

The information charging Mr. DeLozier with murder listed four aggravating circumstances supporting the death penalty:

1.    The defendants, and each of them, created a risk of death to more than one person;

2.    The murders were especially heinous, atrocious or cruel;

3.    The murders were committed for the purpose of preventing a lawful arrest or prosecution;

4.    The existence of a probability that the defendants would commit criminal acts of violence that would constitute a continuing threat to society.

R. Vol. 2 at 4. During the penalty phase of the trial, after the jury had found Mr. DeLozier guilty on both counts of first-degree murder, the State presented no additional evidence in support of the aggravating circumstances. It limited its presentation to calling victim-impact witnesses: Mr. Bullard's son, Joe Bullard, and Mr. Morgan's wife, Phyllis Morgan Setzer. Both testified about the profound effect of the loss of Morgan and Bullard on their families' lives.

Perrine called three witnesses. Mr. DeLozier's mother, Terry Gilbert, testified that Mr. DeLozier's biological father left him when he was very young. When he was three years old, they moved in with his stepfather, Johnny Gilbert, who beat him from the very beginning. The beatings got "really bad" when Mr. DeLozier turned 12 or 13. R. Vol. 10 at 1054. For example, if Mr. DeLozier failed to mow the lawn, Johnny would throw him up against a wall and start calling him names; Johnny's favorite name for him was "shit for brains." *Id.* She volunteered, "I mean you get told enough that you're no good, that's the way he has had to grow up." *Id.* Mr. DeLozier regularly attended church with his

-17-

mother, but they eventually stopped when Johnny got jealous one night and followed them home. As a result of the abuse, Mr. DeLozier became cold and withdrawn. He began using drugs, but without the drugs he was not a bad person.

Mr. DeLozier's aunt, Yolanda Bell, testified that his family life was so bad that he ran away from home at one point and lived with her in Texas. She had known him as a loving, affectionate boy. His sister, Michelle Tate, corroborated that he was regularly abused by his stepfather. She said, "Johnny wouldn't ever hit me because [Mr. DeLozier] would always jump in and let him beat on him instead." *Id.* at 1068. She also testified that he began using drugs heavily once he left home and that he stole from others to support his habit. When asked whether she thought that Mr. DeLozier had turned to drugs to forget about what his stepfather was like, Michelle answered, "Who wouldn't want to forget? You get cut for getting a cookie out of a cookie jar." *Id.* at 1070. Before the drugs, she said, he was a great brother with high spirits.

The court struck the second aggravator with respect to Bullard's murder, explaining that there was insufficient evidence that the killing was especially heinous, atrocious, or cruel. The jury sentenced Mr. DeLozier to death on both counts. With respect to the Morgan murder, the jury found that Mr. DeLozier created a risk of death to more than one person, that he committed the murder with the purpose of avoiding or preventing a lawful arrest or prosecution, and that he constituted a continuing threat to society. Regarding Bullard's death the jury

-18-

found that Mr. DeLozier created a risk of death to more than one person and constituted a continuing threat to society.

## II.     POSTTRIAL PROCEEDINGS

### A.     Direct Appeal

On September 15, 1997, Mr. DeLozier, through his new attorney, Lee Ann Jones Peters, filed with the OCCA an appellate brief that claimed, among other things, that Perrine had provided ineffective assistance of counsel.  He contemporaneously filed an application for an evidentiary hearing to supplement the record regarding his claim that Perrine had failed to investigate and present evidence to discredit Mussett's testimony that he had heard Mr. DeLozier tell Rodney Broades, a fellow inmate, that he had committed two murders.  The OCCA granted the application.

#### 1.     Evidentiary Hearing

At the evidentiary hearing before the trial judge, Perrine testified that as a matter of trial strategy he had decided not to contact Broades.  He had received a copy of an OSBI report of interviews with Broades and Mussett conducted a few days after the incident, and both had reported essentially the same statement. (Broades reported that Mr. DeLozier had said:  "'You mother-fucker, I've killed two people before.  What makes you think I'm afraid to kill a "Nigger?"'" R. Vol. 4 at 438.   Mussett's version was: "You mother-fucker, I've already killed two men and I won't hesitate to kill a Nigger." *Id*. at 437.)  Broades had also

-19-

reported that Mr. DeLozier, referring to the charges on which he was being held, had said that "'[i]f they were Niggers, he would have pled guilty to killing them.'" *Id.* at 438. Perrine feared that if Broades were called as a witness, he might repeat what he had told the OSBI; and if Broades changed his story, he could be impeached by his prior statement, "which would have over emphasized the statement and given it more credibility." R. Vol. 12 at 14. Perrine also worried that the statement, which was laced with racial slurs, would inflame the two African-American jurors against his client. Therefore, Perrine said, rather than interview Broades or call him as a witness, he chose to deemphasize the statement and attack Mussett's credibility. He had visited the jail, including the cells in which Broades and Mr. DeLozier were housed as well as the place in the hall where Mussett claimed to have stood, and had requested that the jury be permitted to visit the jail to see for themselves that Mussett's testimony could not be true. He had also included on the witness list an inmate in McCurtain County Jail at the time of the incident. Although he never called the inmate, and could not remember why, he recalled "feeling satisfied that there was enough evidence in . . . about the physical set-up of the jail. And that's the only reason that I can think that I would have even wanted to call [him.]" *Id.* at 28.

Ruth Castillo, an investigator for Mr. DeLozier, was called to testify whether a face in the bean hole of the Thunderdome (Mr. DeLozier's cell) would be visible from the hallway pivot point. Castillo had visited the jail in August

1997, after the trial and after the facility had ceased serving as a jail. While visiting the facility, she had several pictures taken from various locations. One picture was of the Thunderdome bean hole taken from the point of the hallway where Mussett claimed to have been. Castillo asserted that the picture showed the difficulty one would have in identifying a face in the bean hole. She explained

> I tried to put [the woman with the camera] right at the pivotal point. I went into the cell, and I pressed my face against the Bean Hole in the cement wall. She took a picture. Uh, and, uh, in the picture that I reviewed, uh, has a little sliver of my face, but she—I think she actually moved a little down the wall—down the hall. Now when I—I didn't take a picture of her in the cell. I didn't ask her to do that. It's dirty. But when I stood at the pivotal point and I looked down, I could not see into the Bean Hole at all, because it's recessed. All I could see was the outer cement, uh, uh, wall of it. I couldn't see anything inside of it. When I pressed my face against the Bean Hole, I could not put my face in any way through the Bean Hole, because it hit me on the cheeks, and on my hair.

*Id.* at 70–71.

Next, Mr. DeLozier called Rodney Broades, who testified that Mr. DeLozier had said nothing to the effect of what was stated in the OSBI report. Broades, who had several prior convictions, admitted that he and Mr. DeLozier often argued, but he said that Mr. DeLozier had never admitted to committing the murders or threatened to kill him. He testified that when an OSBI agent had asked him to verify what Mr. DeLozier had allegedly said to him a few days earlier, he had told the agent that the alleged statement "wasn't nowhere in the range of what was said." *Id.* at 83. On cross-examination Broades repeated

that the agent who wrote the report had lied about what he had told the agent. But on redirect Broades admitted that Mr. DeLozier had said, consistent with the report, "[I]f it would have been black people the[y're] saying that I killed, I would have said I done it and pleaded guilty to it." *Id.* at 96.

One of Mr. DeLozier's cellmates, Tony Loving, testified that he recalled a shouting match between Mr. DeLozier and Broades on the day of the alleged incident, but he said that the two were "just calling each other names back and forth," *id.* at 104. He said: "I never heard Mr. DeLozier say he'd kill anyone. Or had killed anyone." *Id.* at 105. He also testified that a person standing at the pivot point of the hallway could not see a face in the Thunderdome's bean hole. For almost a month (though not at the time of the incident) Loving had been a jail trustee, which allowed him, like Mussett, to walk the halls. He said that when a cellblock door near the Thunderdome was open, it would block the view of the bean hole from the pivot point, and that the cellblock door was "always open." *Id.* at 107. He did not, however, say whether a face in the bean hole would have been visible if the door had been closed.

On cross-examination the State elicited that Loving had two prior felony convictions and that he had not paid attention to every argument between Mr. DeLozier and Broades. Then, in response to the trial judge's question whether he had ever heard Mr. DeLozier threaten Broades, Loving contradicted some of his earlier testimony, saying that Mr. DeLozier had told Broades "that he

-22-

would kill his black ass." *Id*. at 115. He added that Mr. DeLozier had "said something about killing him. Said something about, If I would have killed anybody it would have been a nigger . . . ." *Id.* at 117.

The State called two law-enforcement officers in rebuttal. OSBI Agent David Cathey testified that Broades had told him that Mr. DeLozier had said, "'You motherfucker, I killed two people before. What makes you think I'm afraid to kill a nigger?'" *Id.* at 129. Cathey said that he had quoted the words that Broades had used during the interview, which were "almost identical" to those reported by Mussett. *Id.* On cross-examination Cathey admitted that he had not recorded the interview, had not asked Broades to sign the statement, and had not shown Broades the report after it had been transcribed. Next, the State called McCurtain County Sheriff Richard McPeak, who testified that a person standing at the pivot point could "[l]ook around the corner at the six-man cell, and look right here at this Bean Hole and see somebody's face in that Bean Hole. I've stood there several times and looked at them before." *Id.* at 138.

In his findings of facts and conclusions of law, the trial judge concluded that "[f]ailing to call Broades as a witness . . . constituted sound trial strategy," R. Vol. 14, Doc. 51 at 9 (Evidentiary Hr'g - Findings of Fact and Conclusions of Law, Sept. 17, 1998), and did not affect the outcome of the proceeding. The judge said that both Broades and Loving gave inconsistent, impeachable testimony. The trial judge was likewise unpersuaded by the photograph that

purportedly contradicted Mussett's assertion that he had seen Mr. DeLozier's face in the bean hole. He said that it "clearly shows a portion of Mrs. Castillo's face in the bean-hole." *Id.* at 15. The judge concluded:

> Admissible evidence to support th[e] allegation [that Perrine had failed to present evidence that Mussett could not have visually identified Mr. DeLozier through the bean hole] did not exist and was not available to [Perrine]. Appellate counsel fails to identify any witness with a basis of knowledge to support defendant's theory. Photographic evidence was not available to support this theory either, as defendant's most probative photograph (. . . the <u>only</u> photo taken from where Mussett was standing and looking at a face in the beanhole) does not support appellate counsel's theory. Even testimony by Investigator Castillo would have been impeached by her own photograph and the testimony of the Sheriff.
> . . .
>
> Failure to present such a witness or photograph had no effect on the trial proceedings nor could it have impacted the jury's verdict.

*Id.* at 17.

### 2.    OCCA Opinion

The OCCA opinion addressed each of the ineffective-assistance claims argued by Mr. DeLozier in this court, except for the claims regarding the penalty phase, and affirmed his conviction and sentence. Mr. DeLozier's petition for a writ of certiorari was denied by the United States Supreme Court. *See DeLozier,* 528 U.S. 1023**.**

## B.    Application for Postconviction Relief

On December 11, 1998, Mr. DeLozier filed an application for postconviction relief with the OCCA.  Pertinent to this appeal, he argued that Perrine had been ineffective in failing to present evidence of Mr. DeLozier's drug addiction and drug-induced impairment as mitigating factors in the penalty phase of his trial.  In support of the application Mr. DeLozier submitted a report of a psychological examination by Dr. Jeri Fritz, a licensed clinical psychologist.  The report said that use of methamphetamine, a central-nervous-system stimulant, could cause "irritability, insomnia, memory loss, confusion, anxiety, aggression, as well as serious physical problems including cardiac and brain damage." R. Vol. 19, Ex. 13 at 11.  "Prolonged use of methamphetamine," it continued, "can create symptoms that resemble psychiatric diagnoses and are characterized by hallucinations, repetitive behaviors, and paranoia, which can produce suicidal or homicidal thoughts." *Id*.  Although earlier tests of Mr. DeLozier had not revealed any "gross neuropsychological impairment," *id.* at 8,

> [t]he effect of the combination of a prolonged methamphetamine binge mixed with central nervous system depressants would most[] likely have meant that Mr. DeLozier would have been in the highly dangerous "tweaking" stage while at the Tate camp.  He may have most likely been irritable, confused, hyperaroused, agitated, and paranoid.  His behavior would probably have been unpredictable with a high potential for unprovoked violence,

*id.* at 12.  Mr. DeLozier contended that Perrine should have investigated and developed such mitigating evidence.

In addition, Mr. DeLozier claimed that Perrine had been ineffective for waiting until after the guilty verdict to interview members of Mr. DeLozier's family for potentially mitigating evidence. And appellate counsel had been ineffective, according to Mr. DeLozier, because she had failed to claim that Perrine had been ineffective for not presenting mitigating evidence.

The OCCA rejected Mr. DeLozier's claims. His claims with respect to Perrine were procedurally barred, it said, because he had not raised them on direct appeal and his claims did not "turn on facts or information unavailable at the time of his direct appeal." *DeLozier v. State*, No. PC 98-517, slip op. at 6 (Okla. Crim. App. April 28, 1999) (internal quotation marks omitted) R. Vol. 14, located between Docs. 64 and 65). Regarding his claim of ineffective assistance of appellate counsel, the court applied the test set forth in *Walker v. State*, 933 P.2d 327 (Okla. Crim. App. 1997), *overruling recognized by Harris v. State*, 167 P.3d 438 (Okla. Crim. App. 2007), and denied the claim because "[h]e ha[d] not shown appellate counsel breached any duties owed to him, or that appellate counsel's judgment was unreasonable under the circumstances or did not fall within the wide range of professional assistance." *DeLozier,* No. PC 98-517, slip op. at 7–8 (internal quotation marks omitted).

## C.    § 2254 Application

On August 31, 2000, Mr. DeLozier filed his application for relief under 28 U.S.C. § 2254. Together with nine other claims for relief, he raised an

ineffective-assistance-of-counsel claim, advancing the same arguments that he had made before the OCCA on direct appeal and in his application for postconviction relief. The district court rejected his arguments but granted him a COA with regard to his ineffective-assistance-of-counsel claim.

## III. DISCUSSION

### A. Standard of Review

Because Mr. DeLozier filed his application under 28 U.S.C. § 2254 after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), the provisions of that statute apply. *Malicoat v. Mullin*, 426 F.3d 1241, 1246 (10th Cir. 2005). AEDPA establishes deferential standards of review for state-court factual findings and legal conclusions. "AEDPA . . . mandates that state court factual findings are presumptively correct and may be rebutted only by 'clear and convincing evidence.'" *Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004) (quoting 28 U.S.C. § 2254(e)(1)). As for legal conclusions, if the federal claim was adjudicated on the merits in the state court,

> we may only grant federal habeas relief if the habeas petitioner can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Id.* (quoting 28 U.S.C. 2254(d)(1) and (2)). As we have stated:

> Under the "contrary to" clause, we grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court

-27-

on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, relief is provided only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. Thus we may not issue a habeas writ simply because we conclude in our independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (brackets, citations, and internal quotation marks omitted).

## B.     Ineffective Assistance of Trial Counsel

Mr. DeLozier contends that he was denied effective assistance of trial counsel because (1) counsel failed at voir dire to protect his right to be tried by an impartial jury; (2) counsel failed to seek to prohibit disclosure of his prior convictions before eliciting them himself on direct examination; (3) counsel did not call Michelle Tate and Bubba Oliver as witnesses; (4) counsel did not thoroughly impeach Nathaniel Madison's testimony; (5) counsel did not properly and effectively investigate and adduce testimony to counter Mussett's testimony that he had heard Mr. DeLozier's boast of having committed two murders; (6) counsel failed to object to the State's comment on his pretrial silence; (7) counsel did not object to the State's cross-examination of him and its improper arguments to the jury; (8) counsel did not properly and effectively investigate, prepare, and

-28-

adduce mitigating evidence for the penalty phase; and (9) the cumulative effects of counsel's deficient acts rendered counsel's assistance ineffective.

To prevail on an ineffective-assistance-of-counsel claim, Mr. DeLozier must establish (1) that his "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and (2) that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. When reviewing the guilt stage of the trial for prejudice, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. With respect to a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* Our review is "highly deferential" and we "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

### 1.   Voir Dire

Mr. DeLozier claims that Perrine erred by failing to protect his right to be tried by an impartial jury. During voir dire the trial judge informed the

prospective jurors that under Oklahoma law a person convicted of first-degree murder could be punished by death, imprisonment for life with no parole, or imprisonment for life. Four prospective jurors initially indicated that they could not consider the punishments of life in prison or life in prison without parole. Perrine unsuccessfully challenged one for cause, and he used peremptory challenges to strike that juror and another of the four. The other two sat on the jury. Mr. DeLozier contends that Perrine should have challenged for cause the three unchallenged jurors and should have used peremptory strikes to exclude the two who sat on the jury. He also contends that Perrine did not adequately preserve for appeal the trial judge's error in denying his one challenge for cause.

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424 (1985) (internal quotation marks omitted). We discuss each prospective juror in turn.

Juror 14 initially stated, "[A]nyone that has gone in and killed somebody and if it's proven without a doubt whatsoever, no question whatsoever that they did do it then I think they deserve the death penalty." R. Vol. 7 at 281. But when asked by the court whether she could give "fair consideration to life in prison and life in prison with no parole," she said that she could. *Id.* at 282–83. Perrine's

-30-

challenge for cause was overruled, but he later removed this prospective juror with a peremptory strike.

The exchange between Juror 18 and Perrine was as follows:

MR. PERRINE:    Can you imagine a situation where two people were killed and you find somebody guilty of those murders where you give them a life sentence?

JUROR 18:    No.

MR. PERRINE:    What I'm asking is it possible to give somebody a life sentence in your mind could you vote for it and can you perceive of any type of situation when somebody has killed two people or been involved in the killings and still give them a life sentence and think that was appropriate?

JUROR 18:    Yeah.

MR. PERRINE:    That's all we want to know is can you consider all three punishments as a possible?

JUROR 18:    Yes.

MR. PERRINE:    Final conclusion?

JUROR 18:    Yes.

R. Vol. 8 at 325–26. Perrine did not challenge Juror 18 for cause and he sat on the jury.

Juror 41 initially stated that he would have difficulty giving fair consideration to life in prison without parole:

THE COURT:    [C]an you give fair consideration to recommending the death penalty?

-31-

JUROR 41:       Fair consideration?

THE COURT:      Yes, sir.

JUROR 41:       Yeah.

THE COURT:      Can you also give fair consideration to life in prison w[ith] no parole and to life in prison?

JUROR 41:       Not life in prison with no parole.

THE COURT:      You're telling me you cannot even fairly consider that?

JUROR 41:       Well, I don't like it. . . .

. . .

THE COURT:      [W]hat would be required of you would be that and this goes to my question, is if you found the defendant guilty of murder in the first degree beyond a reasonable doubt and if you felt like it was warranted under the facts and circumstances of the case then can you consider—number one, can you consider, fairly consider, the death penalty?

JUROR 41:       Yes, sir.

THE COURT:      You could on that. Now can you also fairly consider life with no parole and life in prison if you are directed by the Court that you should give fair consideration or you must give fair consideration to those punishment options?

JUROR 41:       Yes, sir, if that's what your directions are.

THE COURT:      You could follow that?

JUROR 41:       Yes, sir. I don't like it.

THE COURT:          I understand.  Now that's some of the things that when I went over instructions with you earlier about can you accept and follow the law whether you like it or not and this is not the place to change the law.  But I'm sure the attorneys may have some follow-up questions they'd like to ask you about that.

*Id*. at 511–13.  Perrine did not challenge Juror 41 for cause and he sat on the jury.

Juror 49 similarly seemed to modify her views under questioning:

THE COURT:          [C]ould you give fair consideration to recommending the death sentence?

JUROR 49:           Yes, I could.

THE COURT:          Could you also give fair consideration to life in prison with no parole and life in prison?

JUROR 49:           No.

THE COURT:          You could not even fairly consider those options?

JUROR 49:           I would really, really have to think about it.

THE COURT:          Well, that's why we're here. . . .  My question is could you fairly consider each of the three punishment options?

JUROR 49:           I probably could.  I would really have to think about it and just weigh the situation and probably think it out.

THE COURT:          I understand.  Now the attorneys will . . . have some questions for you I'm sure about how you feel about the death penalty and so forth, but before we move onto that I want to be real sure, that you are able, you are telling me that you are able under those circumstances to consider not only the death penalty but also to give fair

|  |  |
|---|---|
| | consideration to life in prison with no parole and life in prison?  Can you fairly consider each of those? |
| JUROR 49: | It would be real hard. |
| THE COURT: | I understand it would be hard. |
| JUROR 49: | That's just how I feel. |
| THE COURT: | There's nothing easy about being a juror.  I understand.  But I need you to tell me can you give— |
| JUROR 49: | I really couldn't give you an honest answer. |
| THE COURT: | Is there any set of circumstances in the case of a murder in the first degree, any set of facts and circumstances that you feel like you could warrant or justify a life sentence or a life with no parole sentence as opposed to a death sentence? |
| JUROR 49: | There could be circumstances. |
| THE COURT: | Once you heard the evidence in this case could you fairly consider those circumstances and give fair consideration to those two punishment options? |
| JUROR 49: | I guess I could; yes. |

*Id.* at 464–65.  The prosecutor then asked whether, if certain prerequisites for imposing the death penalty were not met, the juror would "have any problem returning a verdict of life or life without parole."  *Id.* at 466.  Juror 49 said, "Probably not; I could probably."  *Id.*  Perrine then questioned the juror:

|  |  |
|---|---|
| MR. PERRINE: | If [the government does not] convince you beyond a reasonable doubt that any of [the] aggravating |

-34-

> circumstances exist you're not even supposed to consider the death penalty. Do you think you could do that?

> JUROR 49:     I probably could.

> MR. PERRINE:     Now the Bible says something about an eye for an eye?

> JUROR 49:     Yes.

> MR. PERRINE:     Sounds like that's what you believe?

> JUROR 49:     I do believe that, yes.

> MR. PERRINE:     That may be fine in your religious beliefs, but when you're in a courtroom you have to set aside that feeling and follow the law. Is that possible?

> JUROR 49:     Yes.

*Id.* at 467–68. Perrine did not challenge Juror 49 for cause, but used a peremptory strike to remove her. *See id.* at 528.

On direct appeal the OCCA ruled that Perrine had not been ineffective with respect to these four prospective jurors. "Generally, an attorney's actions during voir dire are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill chosen that it permeates the entire trial with obvious unfairness." *Neill v. Gibson*, 278 F.3d 1044, 1055 (10th Cir. 2001) (brackets, ellipses, and internal quotation marks omitted). Mr. DeLozier has failed to make such a showing. A reasonable attorney could have found Jurors 18 and 41 acceptable and Juror 49 not

challengeable for cause.  The OCCA's decision was neither contrary to, nor an

unreasonable application of, clearly established federal law.  (As for Juror 14,

Perrine adequately preserved for appellate review his challenge for cause; the

OCCA addressed, and rejected, the argument.)

### 2.  Prior Convictions

Mr. DeLozier testified on direct examination that he had two prior felony

convictions—one for mistreating a police dog and another for killing a police

dog.  He contends that Perrine was ineffective for failing to seek to prohibit

disclosure of his convictions on cross-examination before eliciting them himself

on direct examination.  Under Oklahoma law, evidence of prior felonies "shall be

admitted [for the purpose of attacking the credibility of a witness] if the court

determines that the probative value of admitting this evidence outweighs its

prejudicial effect to the accused."  Okla. Stat. tit. 12, § 2609.  Rather than waiting

for the prosecutor to elicit a conviction on cross-examination, however, defense

counsel may decide to attempt to reduce the sting of the evidence by introducing

it on direct examination.  *See Lamb v. State*, 756 P.2d 1236, 1238 (Okla. Crim.

App. 1988) ("This Court has been unwilling to say that direct examination about

prior felony convictions was not a viable trial strategy.").  Although Mr. DeLozier

acknowledges that this may be a sensible strategy, he argues that Perrine should

not have pursued it without first trying to prohibit disclosure of the evidence

through a pretrial motion *in limine*.

The OCCA reviewed this claim on the merits on direct appeal. It held that "[t]rial counsel was not ineffective for failing, *in limine*, to prevent the disclosure of DeLozier's prior convictions," calling "[t]he basis for this argument . . . tenuous at best." *DeLozier*, 991 P.2d at 32. We must defer to the OCCA's evaluation of the admissibility of impeachment evidence under state law. *See Boyd v. Ward*, 179 F.3d 904, 912 (10th Cir. 1999) ("[W]e defer to state court determinations of state law."). Of course, counsel is not ineffective for failing to make a motion that would not succeed. *See Sperry v. McKune*, 445 F.3d 1268, 1275 (10th Cir. 2006). Given the unlikelihood of a successful motion *in limine*, the OCCA's rejection of this ineffective-assistance claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

### 3. Failure to Call Witnesses

Mr. DeLozier contends that Perrine was ineffective for failing to call Michelle Tate and Bubba Oliver as witnesses. We first address Tate.

Mr. DeLozier asserts that Tate's testimony would have corroborated his defense that Morgan and Bullard were alive after the first trip to the Morgan camp. In an interview following the murders, she told an OSBI agent

> When [Damon Tate, Shawn Smith, and I] arrived at the [Tate] bus I saw MICHAEL DELOZIER standing on the driver['s] side of a turquoise blue Chevrolet pickup truck. The pickup had just stopped and BO and NATHANIEL were standing on the passenger side.

. . .

> [Mr. DeLozier] said that he had borrowed the pickup truck.
> NATHANIEL told me they were going to take it back at least close
> enough *they* could find it. NATHANIEL said they had got the stuff
> from the lake.

R. Vol. 3 at 301 (emphasis added). According to Mr. DeLozier, the italicized

*they* in Nathaniel's statement to Tate refers to Morgan and Bullard and proves

that the two men were alive after the first trip to the Morgan camp, as he testified.

"Generally, the decision whether to call a witness rests within the sound

discretion of trial counsel." *Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir.

1998). Mr. DeLozier has failed to establish that Perrine's decision not to call

Tate as a witness was unsound. Nathaniel's statement to Tate, which, as hearsay,

would have been admissible solely to impeach Nathaniel's testimony, *see* Okla.

Stat. tit. 12, § 2801, was ambiguous. The "they" who "could find" the truck may

have been law-enforcement officers or relatives of the victims, as well as the

victims themselves. More importantly, there would be no reason to assume that

Nathaniel was telling the truth. After all, he did not contradict Mr. DeLozier's

statement to Tate that the three men had "borrowed" the truck. Nathaniel

apparently felt no urge to expose the lie to Tate. The OCCA ruled that Perrine's

decision not to call Michelle as a witness was not deficient performance.

*DeLozier*, 991 P.2d at 32. Given the marginal probative value of Tate's

testimony, we hold that the OCCA's decision was not an unreasonable application of, or contrary to, clearly established federal law.

As for calling Bubba Oliver, Mr. DeLozier contends that Bubba would have (1) contradicted Nathaniel's testimony that Mr. DeLozier shot Morgan and Bullard on the first trip to the Morgan camp, and (2) corroborated his and Wooten's testimony that gunshots were fired, and the fires started, by someone other than Mr. DeLozier after he had returned (without the Madisons) to the Tate bus. There is support in the record that Bubba could have provided evidence on the first subject: In an interview with the OSBI, Bubba gave the following account:

> A short time after they got the [Morgan] pickup unloaded, [Damon] TATE, MICHELLE and SHAWN SMITH left in TATE's pickup. [Bubba] then asked NATHANIEL MADISON if they had killed the men at the camp. NATHANIEL replied to [Bubba] that they didn't kill them, they changed their minds when they got there and had just stolen some of the stuff from the camp.

R. Vol. 4 at 418. He apparently testified similarly at the preliminary hearing:

> I asked [Nathaniel] earlier in the bus, you know, did they kill them and he said no that they . . . had their stuff loaded up going to leave the next day and he supposedly figured that's what it was all loaded up for and that's what I figured they just got in it and took off, they . . . was pretty wasted earlier that day so I figured that was pretty believable you know for them to be asleep.

Aplt. Br. at 21–22 (The record does not contain a transcript of the preliminary hearing, but the State does not challenge this quotation in Mr. DeLozier's brief.). If Bubba had so testified at trial, the testimony would have been admissible to

impeach Nathaniel. On the second subject, Mr. DeLozier can point to Wooten's testimony—that she, Bubba, and Mr. DeLozier were together when they saw the fire at the Morgan campsite and heard gun shots and an explosion—and assume that Bubba would have testified similarly. Mr. DeLozier asserts that Bubba would actually have been a superior witness to Wooten, contending that Bubba "was much more familiar with the woods than the young Ms. Wooten[,] so he would have been able to provide details as to time, distance, and the sound of gun shots." *Id.* at 25. He does not, however, cite to anything in the record on appeal showing Bubba's version of these events.

In any event, even if Perrine had believed that Bubba would testify about the fires and gunshots as described in Mr. DeLozier's brief, it would have been reasonable strategy not to call him as a witness. Bubba had made very incriminating statements during his interview with the OSBI. Contrary to Mr. DeLozier's trial testimony that he had not seriously discussed killing the men at the Morgan camp, Bubba told the OSBI that *everyone* had discussed killing Morgan and Bullard. Indeed, according to Bubba, Mr. DeLozier said: "'We could sneak through the woods and they could not hear us because of the generator running. We could open the door and blow their heads off.'" R. Vol. 4 at 417. After Bubba had tried for two hours to convince Bo, Nathaniel, and Mr. DeLozier that there was no need to kill Morgan and Bullard, someone said, "'Let's go smoke them, come on.'" *Id.* Bubba responded, "'I'm not going. I

-40-

ain't got the balls to kill anybody,'" and stayed at the Tate bus with Wooten. *Id.* When Nathaniel, Bo, and Mr. DeLozier had returned from the Morgan camp, Bubba expected them to return with news of their having killed somebody and asked both Mr. DeLozier and Nathaniel if they had done so. Rather than deny killing them, Mr. DeLozier admonished Bubba to keep quiet in front of Michelle.

A reasonable attorney could decide that the risk of Bubba's testimony conforming to what was in the OSBI report (or his being impeached by an OSBI witness if his testimony was to the contrary) greatly outweighed any advantage from Bubba's duplicating Wooten's account (which appears credible) and stating that Nathaniel had denied that they had killed anyone when the three men returned to the Tate bus with their loot. The OCCA ruled that Perrine's failure to call Bubba "was not so egregious that it indicates deficient performance, falling outside the wide range of reasonable professional assistance." *DeLozier*, 991 P.2d at 32. This ruling was not an unreasonable application of, or contrary to, clearly established federal law.

### 4. Cross-Examination of Nathaniel Madison

Mr. DeLozier contends that Perrine was ineffective for failing to impeach Nathaniel Madison's testimony more thoroughly by showing inconsistencies with his statements to the OSBI. He points to the following inconsistencies between Nathaniel's trial testimony and his first statement to the OSBI: (1) At trial Nathaniel testified that upon arriving at the Morgan camp, Mr. DeLozier and Bo

-41-

stepped into the camper and each fired a shot. Several minutes later Morgan stepped out and Mr. DeLozier shot him; neither Mr. DeLozier nor Bo reentered the camper to kill Bullard. In his first statement to the OSBI, however, Nathaniel had said that Morgan and Bullard were ordered out of the camper, that Morgan was shot first, and that Mr. DeLozier and Bo then entered the trailer to shoot Bullard. (2) Nathaniel also testified at trial that he and Bo never left the Tate bus without Mr. DeLozier. Yet in his first statement to OSBI agents he said that in the early morning, after the first trip to the Morgan camp (when Morgan and Bullard were murdered and he, Bo, and Mr. DeLozier stole the truck and the goods), he and Bo left the Tate bus for a short while and returned after Mr. DeLozier, Wooten, and Bubba had left. Mr. DeLozier contends that pointing out such inconsistencies would have weakened Nathaniel's credibility and shown the jury that he and Bo had an opportunity to commit the crimes without Mr. DeLozier.

This court has repeatedly stated that "counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy." *Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005). Mr. DeLozier has failed to show that the strategy employed here was not sound. Perrine questioned Nathaniel on several inconsistencies between his statements to the OSBI and his testimony. At trial Nathaniel testified that Bo had not stated that he was going to kill Morgan and Bullard and take their belongings, but he did admit that he may

have told OSBI agents otherwise in his second interview. Additionally, he testified that the murders occurred on the first trip to the Morgan camp and that he, Bo, and Mr. DeLozier were together on every trip made to the camp. But on cross-examination, Perrine pointed out that Nathaniel had told OSBI agents in his first interview that Mr. DeLozier made a trip to the camp by himself and, when he returned, told Nathaniel and Bo that he had set fire to the campsite. Nathaniel said that he did not remember making that statement; but that if he had, it was a lie. Perrine even got Nathaniel to admit that he was capable of lying under oath. Moreover, when an OSBI agent later testified about Nathaniel's first statement, Perrine elicited from him two things that Nathaniel had said that were contrary to his trial testimony.

Perhaps Nathaniel could have been impeached further with his statements to the OSBI, but emphasizing those statements could produce only limited dividends because they were consistent with his testimony on the essentials: in both statements he asserted that Mr. DeLozier had killed Morgan and Bullard. In any event, Perrine obtained substantial concessions from Nathaniel—in particular, his admissions that he might lie under oath and that he received a great benefit (the lighter sentence) for testifying against Mr. DeLozier. The OCCA ruled that Perrine's failure to impeach Nathaniel at greater length did not constitute deficient performance. *See DeLozier*, 991 P.2d at 32. This ruling was not an unreasonable application of, or contrary to, clearly established federal law.

### 5. Impeachment of Jailhouse Confession

Mr. DeLozier contends that Perrine did not perform adequately in impeaching Mussett's testimony that during an argument in the county jail Mr. DeLozier had boasted about committing two murders. Mussett, who had been an inmate trustee at the jail, testified that he had heard Mr. DeLozier yell to another inmate, Rodney Broades, "I've already killed two men, mother fucker; I won't hesitate to kill you." R. Vol. 9 at 726. He reported the event to officials the following day.

On cross-examination Mussett said that when the statement was made, he was standing at the pivot point of the jail's L-shaped hallway and could see both Mr. DeLozier and Broades. He testified that Mr. DeLozier's face was visible in the opening in the cell door known as the bean hole, but he admitted that he could not have seen into Mr. DeLozier's cell. Perrine also elicited from Mussett that he did not know Mr. DeLozier at the time and "wouldn't know his voice from Adam." *Id*. at 730. In addition, Mussett admitted that he had known the victims all his life and knew when he was sent to jail that the people accused of killing them would be there. When asked whether he felt that he was helping the Morgans and Bullards by testifying, he said that he did not know. After Mussett's testimony, Perrine requested that the jury be permitted to visit the jail, saying, "I went down there at lunch time and looked and . . . [t]here's no way; you can't get

enough of your face in that bean hole to identify who it is." *Id*. at 770. The judge, however, denied the request.

Mr. DeLozier argues that Perrine should have done more to undermine Mussett's testimony. First, he contends that Perrine should have called Broades and other witnesses to testify that Mr. DeLozier had never made the alleged statement. In support of this claim Mr. DeLozier points to testimony by Broades and Loving (one of Mr. DeLozier's cellmates) at the evidentiary hearing on remand from the OCCA, in which both said that Mr. DeLozier had not made the statement. Broades testified at the hearing that Mr. DeLozier had neither threatened to kill him nor admitted to having committed two murders, and he claimed that the statements in the OSBI report "[were]n't nowhere in the range of what was said." R. Vol. 12 at 83. Loving testified at the hearing: "I never heard Mr. DeLozier say he'd kill anyone. Or had killed anyone." *Id*. at 105.

Next, Mr. DeLozier contends that Perrine should have offered evidence, such as testimony explaining—and pictures, sketches, and drawings showing—that from the pivot point Mussett could not have seen Mr. DeLozier's face in the bean hole. Loving testified at the evidentiary hearing that a cellblock door, if open, would have prevented Mussett from seeing a face in the bean hole. And Ruth Castillo, a defense investigator, testified, and offered a photograph as proof, that Mussett could not have seen from the pivot point a face in the bean

-45-

hole. Mr. DeLozier argues that Perrine's failure to present this evidence constitutes deficient performance. We disagree.

Perrine's investigation and strategy regarding Mussett's testimony was reasonable. Before trial Perrine had been given a copy of Broades's statement to the OSBI just days after the incident, in which he reported that Mr. DeLozier had said: "'You mother-fucker, I've killed two people before. What makes you think I'm afraid to kill a "Nigger?"'" and "'If they were Niggers, [I] would have plead guilty to killing them.'" R. Vol. 4 at 438. Even if Broades had testified to the contrary at trial, the prosecutor would certainly have offered his prior statement to impeach him. Moreover, in light of Broades's statement, Perrine could reasonably have considered it unproductive to look for inmates who may have supported Mr. DeLozier's defense. Perrine therefore chose a path that would not emphasize the statement while attacking Mussett's credibility on cross-examination. To this end he questioned Mussett's motive for testifying, highlighting Mussett's relationship with the victims' families and the possible benefits that his cooperation could have had on his treatment in jail. Perrine also investigated the physical layout of the jail, both before trial and after the trial had begun, and elicited from Mussett that one could not see into Mr. DeLozier's cell from the pivot point, and that Mussett could not have identified Mr. DeLozier's voice. Although Perrine might have called a witness to testify to the difficulty of seeing a face in the bean hole from the pivot point, such testimony could easily

-46-

have degenerated into a swearing match that would not advance the defense while emphasizing the importance of Mr. DeLozier's statement.

In retrospect, Perrine's strategy was prescient. At the evidentiary hearing both Broades and Loving proved to be less-than-helpful witnesses, despite their initially favorable testimony, on which Mr. DeLozier now relies. Both had significant criminal records. Broades admitted that he and Mr. DeLozier had argued and that during the course of the argument Mr. DeLozier had said, "[I]f it would have been black people [they're] saying that I killed, I would have said I done it and pleaded guilty to it." R. Vol. 12 at 96. And an OSBI agent later testified at the hearing that his report had quoted verbatim Broades's account of what Mr. DeLozier had said. As for Loving, he testified in response to a question from the trial judge that he had heard Mr. DeLozier tell Broades "that he would kill his black ass," *id.* at 115, and, "If I would have killed anybody it would have been a nigger . . . ," *id.* at 117. Likewise, the additional evidence regarding the (lack of) visibility of a face in the bean hole would have been of limited benefit. Loving did testify that the cellblock door, if open, would have blocked the view of the bean hole from the pivot point; but he never discussed what the visibility would have been if the door had been closed. Moreover, Sheriff McPeak testified at the hearing that on several occasions he had identified faces in the bean hole from the pivot point, and the photograph offered by Castillo corroborated that testimony.

Addressing the contention that Perrine was ineffective for failing to call Broades as a witness and failing to present evidence that Mussett could not have seen Mr. DeLozier's face, the OCCA ruled "that counsel's failure to utilize all possible evidence did not alter the outcome of this trial." *DeLozier*, 991 P.2d at 34. This ruling was neither contrary to, nor an unreasonable application of, clearly established federal law.

Finally, Mr. DeLozier requests a new evidentiary hearing, alleging that "his Constitutional Due Process rights were violated when he did not get a full and fair evidentiary hearing in the state court before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Aplt. Br. at 39. When, as here, the habeas applicant made the showing necessary to obtain an evidentiary hearing in state court, that hearing must be a fair one. *See Townsend v. Sain*, 372 U.S. 293, 312 (1963) ("[T]he federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court."), *overruled on other grounds Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5-6 (1992).

Mr. DeLozier contends that the judge's campaign promise to put people in jail, the public opinion of the crime, and the judge's predisposition regarding counsel's performance rendered the hearing fundamentally unfair. The district court, however, rejected Mr. DeLozier's claim that the state-court evidentiary hearing was neither full nor fair:

> The trial judge is in the best position to evaluate counsel's conduct during a trial. To expect that a trial judge would not have some preconceived notions about the conduct he has observed first hand in his courtroom would be absurd. This Court's view of the record does not support [Mr. DeLozier's] assertion that he did not receive a "fair" evidentiary hearing below.

Aplt. Br., Attach. 2 at 24 n.4. Even if the trial judge's evaluation of the evidence at the hearing could be questioned on the ground of bias, Mr. DeLozier points to no errors in the presentation of evidence. Given that evidence, the trial judge's evaluation was eminently reasonable, an evaluation that has commended itself to every later court to address the issue, including this one. Mr. DeLozier has failed to establish that the evidentiary hearing conducted in state court was not full or fair. We affirm the district court's denial of his request for a new evidentiary hearing.

### 6. Reference to Pretrial Silence

Mr. DeLozier claims that Perrine was ineffective for failing to object to questions on cross-examination that violated his Fifth Amendment right to remain silent. The exchange at issue was as follows:

Q.    How long did it take you to arrive at this story you just told this jury? Let's see it's May 20 something and this happened in September. That's five–that's eight months; right?

A.    I've been in jail, yes, eight months.

Q.    No. I asked how long did it take you to come up with the story you just told this jury?

A.    The whole time I was in the woods.

Q.    I figured that.

R. Vol. 10 at 929.

We have held that "the test for determining if there has been an impermissible comment on a defendant's right to remain silent at the time of his arrest is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." *United States v. Mora*, 845 F.2d 233, 235 (10th Cir. 1988) (brackets and internal quotation marks omitted). But "[m]anifest intent will not be found if some other explanation for the prosecutor's remark is equally plausible." *Id.* (brackets and internal quotation marks omitted). In particular, if a defendant testifies at trial, the prosecutor may use the defendant's earlier silence "to rebut the defendant's trial testimony[, although] the government may not attempt to use it as substantive evidence of guilt." *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996).

Here, the OCCA construed the cross-examination as "more in line with questioning regarding 'how long did it take for you to come up with such a ridiculous story?'" *DeLozier*, 991 P.2d at 28. It ruled that because the question was not "a reference to DeLozier's pre-trial silence," *id.*, it "[could not] say that the failure to object to th[is] comment[] was ineffective assistance of counsel." *Id.* at 32. This characterization of the disputed questioning is a reasonable one. Therefore, the OCCA's determination that Perrine was not ineffective was neither

-50-

contrary to, nor an unreasonable application, of clearly established federal law. Mr. DeLozier has not pointed to any Supreme Court precedent that would have required a contrary ruling by the OCCA.

### 7. Improper Cross Examination and Closing Argument

Mr. DeLozier contends that Perrine's failure to object to his cross-examination by the prosecutor or to the prosecutor's closing argument constituted ineffective assistance of counsel. But his brief does not identify specific improper questions asked during cross-examination (other than the alleged reference to pretrial silence, which was addressed above), nor does it point to any specific improper comments in the closing argument. In the absence of such specifics, we can afford no relief. *See* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the . . . parts of the record on which the appellant relies . . . ."); *Cummings v. Sirmons*, 506 F.3d 1211, 1228 (10th Cir. 2007) (appellate claim fails on merits when appellant fails to "identify any specific instances to support [a] general assertion" of error).

### 8. Mitigating Evidence

Mr. DeLozier claims that Perrine was ineffective because he did not properly and effectively investigate, prepare, adduce, and explain mitigating evidence. He contends that Perrine did not begin investigating mitigating evidence until after the guilt stage of trial, and even then spoke with only a few

family members during the brief time before the penalty phase began. He argues that because of the inadequate investigation, Perrine failed to paint the full picture of his severe emotional and physical abuse at the hands of his stepfather, or to inform the jury of the effects of his drug use at the time of the offense; in particular, he says that Perrine should have retained an expert to examine Mr. DeLozier and to explain to the jury "the psychological and behavioral effects of DeLozier's addiction to the drugs as well as the severe level of mental impairment which stemmed therefrom." Aplt. Br. at 53.

We hold that Mr. DeLozier's claim of ineffective assistance of trial counsel is procedurally barred. Mr. DeLozier raised an ineffective-assistance-of-trial-counsel claim in his state application for postconviction relief, but the OCCA refused to consider it because it had not been raised on direct appeal and "[did] not turn on facts or information unavailable at the time of his direct appeal." *DeLozier*, No. PC 98-517, slip op. at 6. *See* Okla. Stat. tit. 22, § 1089(C) ("[t]he only issues that may be raised in an application for post-conviction relief are those that . . . [w]ere not and could not have been raised in a direct appeal.").

"On habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir.1998). The Oklahoma requirement that a claim of ineffective assistance of trial counsel

be raised on direct appeal is an "adequate" ground for procedural default only if (1) the defendant's counsel on direct appeal is different from trial counsel and (2) for claims that cannot be resolved on the trial record alone, Oklahoma offers a "procedural mechanism on direct appeal whereby defendants can adequately develop the factual basis of their ineffective assistance claims." *Id.* at 1263.

Mr. DeLozier raises two challenges to the procedural bar in this case. First, he contends that the *English* requirements for adequacy were not satisfied. He concedes that the first requirement was satisfied; his appellate counsel had not been his trial counsel. But he contends that his ineffectiveness claim could not "be resolved on the trial record alone." Aplt. Reply Br. at 26. Although this contention is true—Mr. DeLozier would indeed need to supplement the trial record to establish that his trial counsel was ineffective in failing to present mitigation evidence—it is not sufficient to show that *English*'s second requirement was not satisfied. Under *English* the Oklahoma procedural-bar rule is adequate even when the claim of trial-counsel ineffectiveness cannot be resolved on the trial record alone, so long as the State provides a procedural mechanism to supplement the record. Not only has Mr. DeLozier failed to suggest that Oklahoma lacked such a mechanism at the time of his direct appeal, *see* Okla. Stat. tit. 22, ch. 18, App. Rule 3.11 (providing for supplementation of record), but he was able to invoke the rule in his direct appeal to make a record

regarding the Mussett testimony.  He has not explained why he could not likewise have supplemented the record regarding mitigation evidence.

Mr. DeLozier's second challenge to the procedural bar is his contention that the bar can be overcome by his demonstration of cause and prejudice.  He argues that the cause for his failure to raise his mitigation-ineffectiveness claim on direct appeal was the ineffectiveness of his appellate counsel.  We disagree and therefore reject his challenge without the need to consider prejudice.

We review de novo this claim of ineffective appellate counsel.  Although the OCCA held that Mr. DeLozier's direct-appeal counsel was effective, it reached that conclusion by applying the test set out in *Walker*, 933 P.2d at 334. *See DeLozier,* No. PC 98-517, slip op. at 6–8.  Because that test is contrary to federal law, we do not defer to the OCCA's ruling.  *See Malicoat*, 426 F.3d at 1248 (the "OCCA's three-part [*Walker*] standard does not comport with the established federal standard for evaluating Sixth Amendment ineffective assistance of counsel claims under *Strickland*.").

Mr. DeLozier's claim on appeal is that Peters, his counsel on direct appeal, failed to investigate and raise a claim that Perrine had been ineffective in investigating and presenting mitigating evidence at the penalty phase of his trial. To sustain a claim of ineffectiveness of appellate counsel, that counsel's "representation must fall below an objective standard of reasonableness."  *Id.* (internal quotation marks omitted).  "A claim of appellate ineffectiveness can be

based on counsel's failure to raise a particular issue on appeal, although it is difficult to show deficient performance under those circumstances because counsel 'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). "[I]f the omitted issue has merit but is not so compelling, [we must assess] the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance." *Id.* "In reviewing a claim of ineffectiveness we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and avoid judging counsel's performance using the distorting benefit of hindsight." *Fisher v. Gibson*, 282 F.3d 1283, 1293 (10th Cir. 2002) (internal quotation marks omitted).

In light of the information in her possession, Peters could reasonably have decided not to pursue a claim of ineffective assistance of trial counsel. First, Perrine had introduced the gist of the lay testimony that Mr. DeLozier now contends should have been presented to the jury. At the penalty stage of trial, Perrine had introduced evidence, through testimony from Mr. DeLozier's mother, sister, and aunt, that Mr. DeLozier had been abandoned by his biological father as an infant and had, since he was a young child, suffered severe physical and

emotional abuse at the hands of his stepfather, whose favorite name for him was "shit for brains." R. Vol. 10 at 1054. Mr. DeLozier's mother testified that the abuse started when Mr. DeLozier was three and escalated when he turned 12 or 13. His aunt testified that Mr. DeLozier's family life was so bad that he once ran away from home and lived with her in Texas. His sister testified to the abuse he received from his stepfather and how he protected her from attacks by intervening and taking the blows himself. She reported that he turned to drugs to forget about the abuse from his stepfather, stating, "Who wouldn't want to forget? You get cut for getting a cookie out of a cookie jar." *Id.* at 1070. When he left home, she said, he began using drugs heavily and stole from others to support his habit. Perhaps additional evidence of abuse could have been presented, but the evidence at trial certainly conveyed the essence of the problem. Importantly, Mr. DeLozier does not identify any specific statements from specific witnesses that would have added materially to the trial testimony.

As for expert testimony, Mr. DeLozier contends that an expert could have explained the psychological and behavioral effects that the abuse and severe drug addiction had on him. He submits a report of Dr. Jerri Fritz, a clinical psychologist, stating that Mr. DeLozier "was a high intensity user of methamphetamine who had been on a three week binge." R. Vol. 19, Ex. 13 at 12. Accordingly, he "most likely . . . would have been in the highly dangerous 'tweaking' stage while at the Tate camp," meaning that "[h]is behavior would

probably have been unpredictable with a high potential for unprovoked violence."
*Id.* The report also states that "Mr. DeLozier's antisocial attitudes and behaviors most likely directly reflect the dysfunctional, violent, and corrupt environment in which he was reared." *Id.*

But Peters did not have Dr. Fritz's report when handling the state appeal. Rather, she had retained a different expert, Dale Watson, Ph.D., to perform a "comprehensive forensic neuropsychological assessment." *Id.* at 8. Dr. Watson's report is not part of the record, but Dr. Fritz's report summarizes it as follows:

> Dale Watson, Ph.D. examined Mr. DeLozier in August of 1997 to identify mitigating factors that might have been presented at his original trial and to explore the issue of future dangerousness. Dr. Watson's test findings did not reveal the presence of gross neuropsychological impairment. Mr. DeLozier's intellectual functioning was within the low average range of abilities. His testing did strongly suggest that Mr. DeLozier had a substance abuse disorder. Dr. Watson's report indicated that Mr. DeLozier's personality testing offered a diagnosis of "[]Antisocial Personality Disorder, a Schizoid Personality Disorder with Passive-Aggressive (Negativistic) personality traits and Self-Defeating personality traits in addition to Psychoactive Substance Abuse (NOS) and Adjustment Disorder with Anxiety and Alcohol Abuse." Although Mr. DeLozier's score on the Hare Psychopathy Checklist-Revised were below cutoff scores for psychopathy, he was determined to present a higher risk for future violence if he were released from custody, than the average inmate is.

*Id.* Although some of what Dr. Watson said may have been helpful to Mr. DeLozier, it could have been devastating for the jury to hear of his "higher risk for future violence if he were released from custody." *Id.* Contrary to Mr. DeLozier's repeated assertions in his briefs to this court, the Supreme Court's

decisions in *Brewer v. Quarterman*, 127 S. Ct. 1706 (2007), and *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654 (2007), do not require counsel to put on evidence that may be a two-edged sword; rather, that decision merely says that if evidence can be used to support both diminished blameworthiness and future dangerousness, the jury instructions cannot preclude consideration of the evidence for mitigation. *See id.* The issue for counsel, in contrast, is not *how* trial evidence is to be considered by the jury, but *whether* to present the evidence to the jury—that is, whether putting on the evidence is more likely to help or hurt the defendant.

Based on the information known to Peters, it would have been quite reasonable for her to decide that she could not have persuaded the OCCA that Perrine's failure to present an expert witness had prejudiced Mr. DeLozier. The decision not to pursue on direct appeal this ineffectiveness claim must be given deference, *see Fisher*, 282 F.3d at 1293, and we hold that Peters was not herself ineffective in making this decision.

We recognize that Peters's decision not to raise the issue may not be entitled to deference if she had not adequately investigated the matter before making the decision. *See Anderson v. Sirmons*, 476 F.3d 1131, 1145–46 (10th Cir. 2007). One might argue that Peters conducted an inadequate investigation because she failed to discover Dr. Fritz's views. But counsel is not required to keep hiring experts until the most favorable one possible is found.

Mr. DeLozier's briefs in this court have not pointed to any lapse in investigation by Peters. All they cite as proof of her investigation's inadequacy is a December 1997 disclaimer by Peters submitted to the OCCA on direct appeal, which states that she "has not conducted and cannot conduct a full investigation of Appellant's case" because of insufficient resources. R. Vol. 19, Ex. 6 at 2. Yet Peters did not specify what issues she could not pursue; in particular, she did not specifically refer to mitigation. Such a conclusory, bald assertion proves nothing. After all, she had retained an expert—Dr. Watson—several months earlier and she also conducted enough of an investigation regarding Mussett's testimony to convince the OCCA to remand for an evidentiary hearing. Accordingly, we hold that Mr. DeLozier has not shown that we should refrain from deferring to Peters's decision on the ground that she conducted an inadequate investigation regarding mitigation. Because Mr. DeLozier has not shown cause (ineffective assistance of appellate counsel) that would excuse his failure to raise on his state direct appeal his claim that trial counsel was ineffective in investigating and presenting mitigation evidence, we hold that he is procedurally barred from raising that claim before us.

### 9. Cumulative Effect

Finally, Mr. DeLozier incorporates his arguments above and claims that, in the aggregate, Perrine's deficient acts rendered his assistance ineffective. Mr. DeLozier has failed, however, to establish error with respect to any of the

properly preserved issues raised in his brief.  Therefore, there can be no

*cumulative* error.  *See Jones v. Stotts*, 59 F.3d 143, 147 (10th Cir. 1995).

**C.      Ineffective Assistance of Appellate Counsel**

Mr. DeLozier claims that Peters, his appellate counsel, was ineffective for

failing to raise on direct appeal a claim of ineffective assistance of trial counsel

for failure to present additional mitigating evidence.  But as we have shown,

Peters's decision not to raise the issue on direct appeal was reasonable.  Therefore

Mr. DeLozier's claim fails.

**IV.     CONCLUSION**

We AFFIRM the district court's denial of § 2254 relief.