**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 23, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEONARD GEORGE PAGE,

Defendant-Appellant.

No. 08-8050
(D.C. No. 2:08-CR-00006-ABJ-1)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **McCONNELL**, **McKAY**, and **GORSUCH**, Circuit Judges.

Leonard George Page, known as "Georgie," was charged by indictment with two criminal counts: (1) one count of conspiracy "to possess with intent to distribute, and to distribute, transdermal patches containing a mixture or substance containing a detectable amount of Fentanyl, a Schedule II controlled substance, the use of which resulted in the death of Stephanie Buckert[,]" in

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C), Aplt. App. at 7-8; and (2) one count of "distribut[ing] a transdermal patch containing a mixture or substance containing a detectable amount of Fentanyl, a Schedule II controlled substance, the use of which resulted in the death of Stephanie Buckert[,]" in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), Aplt. App. at 8. At the end of a three-day jury trial, Mr. Page was found guilty of conspiracy in count one but was acquitted of distribution in count two. *Id.* at 10, 19, 440-41. Later, he was sentenced to life imprisonment, as well as required to pay a special assessment, and fine. *Id.* at 11, 15. Mr. Page now appeals from his conviction, arguing that the evidence was insufficient to support the guilty verdict on the conspiracy charge. We must disagree, and so affirm.

\* \* \*

In the late night hours of November 9, 2007, into the early morning hours of November 10, 2007, police officers and emergency medical services responded to an emergency medical call at Mr. Page's residence in Rock Springs, Wyoming. Aplt. App. at 281-83. They found Mr. Page and his wife attempting to perform CPR on the victim, Stephanie Buckert. *Id.* at 45, 283-84. After police and medical personnel also attempted to restart Ms. Buckert's heart, she was transported to the hospital, where she was pronounced dead on arrival at approximately 1:30 a.m. *Id.* at 45, 166, 284. A forensic pathologist, John Carver,

M.D., determined after an autopsy that she died from acute fentanyl toxicity—"a very high level of fentanyl[,]" an opiate drug. *Id.* at 238, 240, 257.[1]

Eric Conn testified that Stephanie Buckert was his common-law wife, *id.* at 112-13, although they were renting separate living quarters until they could get back on their feet and get their own place in another state, *id.* at 121-23, 150-52. Mr. Conn said that he worked for Mr. Page at a lawn care company when he and Ms. Buckert lived in Rock Springs. *Id.* at 111. He stated that Ms. Buckert called him to pick her up on the afternoon of November 8, when he had been doing lawn care work all day with Mr. Page, his wife, Belinda, and their son, Scott. *Id.* at 118, 120, 161. They got off work in the mid-afternoon. *Id.* at 118. Mr. Conn drove Mr. Page in the latter's pickup truck to pick Ms. Buckert up at the residence where she rented a room. *Id.* at 121, 124. While in the truck, Ms. Buckert asked if Mr. Page had any pain medication or narcotics, and "Georgie had said, you know, sure[,]" *id.* at 119, 124-125, and "let's go down to Christy's[,]" *id.* at 125. They went to the Saddle Lite Motel, Room Number 11, where Mr. Page's sister, Christy Harlow, was staying. *Id.* at 119. Mr. Conn said that when he, Ms. Buckert, and Mr. Page arrived there, Mr. Conn saw other

---

[1] Apparently, fentanyl is a group of prescription pain killers significantly more potent than morphine and having the same biological effect of heroin, "'with the exception that the fentanyls may be hundreds of times more potent.'" *United States v. King*, 516 F.3d 425, 426 n.1 (6th Cir. 2008) (quoting U.S. Drug Enforcement Administration website, http://www.usdoj.gov/dea/concern/fentanyl.html).

people already in the "economy-size" motel room—Christy and Warren Harlow, and a friend of Christy's, Lisa Mondragon.  *Id.* at 88, 127.

Mr. Conn testified that Mr. Page asked his sister where to get pain medications.  *Id.* at 128.  Mr. Conn saw Christy Harlow make some calls on her cellphone.  *Id.* at 129.  Mr. Page also borrowed her phone to make a couple of calls, and then told Ms. Buckert it would be $60.  *Id.* at 128-29.  Ms. Buckert handed $60 cash directly to Mr. Page for the drugs.  *Id.*  Mr. Conn and Ms. Buckert left the motel briefly, then went back to Room Number 11.  *Id.* at 119.  Mr. Conn saw through the open doorway that "there was a folded, . . . square piece of paper or square package that was laying on the bed."  *Id.* Ms. Buckert went into the room, picked up the package, and put it in her purse, and then she, Mr. Conn, and Mr. Page left in Mr. Page's truck to go to Mr. Page's residence.  *Id.* at 119, 131.  On the way there, Mr. Page told Ms. Buckert that when she took the patch out of its packaging, she could heat it up with a hair dryer to make it release the medication at a faster rate.  *Id.* at 132.  Mr. Conn asked Ms. Buckert what it was, and she said it was "a morphine-based fentanyl patch."  *Id.* at 132-33.  Mr. Conn and Ms. Buckert stopped at Mr. Page's residence for about a half an hour, and then Mr. Conn took Ms. Buckert back to her residence, and then went on a work-related errand.  *Id.* at 119, 133-34.  After that, he dropped the truck off either at Mr. Page's house or at the motel.  *Id.* at 134-35.

Later in the evening of November 8, around 10 p.m., Ms. Buckert walked to Mr. Conn's residence, and they stayed up until about 1 a.m. *Id.* at 135-37. The next day, November 9, Ms. Buckert continued to sleep through the morning. *Id.* at 138. Mr. Conn watched her because she was sick with a "kind of lung bronchial infection" and had been to the hospital about that earlier in the week. *Id.* at 137, 139. She also had a prescription for Lortabs and Valium and used those drugs every day—sometimes taking more than the prescribed dosage, which left her "out of it[.]" *Id.* at 169, 175. Mr. Conn periodically checked on her, and noticed that she was going back and forth between being hot and cold. *Id.* at 139. Mr. Page came to the residence at about 10 a.m. to find out why Mr. Conn had not shown up for work, and Mr. Conn told him he was keeping an eye on Ms. Buckert. *Id.* at 140. Mr. Conn asked Mr. Page whether the drug Mr. Page had given her could be mixed with the other medication she was taking. *Id.* at 140-41. Mr. Conn said that Mr. Page touched his lips to her forehead to check for a fever and said he thought she was okay. *Id.* at 141-42. Mr. Page left shortly after that. *Id.* at 142.

Mr. Conn said that Ms. Buckert's friend, Tina Clark, came by sometime between 11 a.m. and 1 p.m. and noticed that Ms. Buckert was pale. *Id.* at 142, 145. Mr. Conn asked Ms. Clark if she knew anything about "this patch thing that [Ms. Buckert] had gotten from Georgie[.]" *Id.* at 143. Ms. Clark saw that Ms. Buckert was sweating, so she and Mr. Conn took the blankets off of her,

pulled her shirt off, and found the patch on her skin under her left breast. *Id.* That was the first time that Mr. Conn actually knew that Ms. Buckert had put the patch on—he did not see it the night before because he and Ms. Buckert had "passed out with our clothes on[.]" *Id.* at 146. Ms. Clark took the patch off Ms. Buckert and handed it to Mr. Conn. *Id.* at 143. He wrapped the patch with medical tape onto a plastic package of guitar strings because Ms. Buckert had told him it contained three days' worth of medication as long as it was kept wrapped, and then he threw it into a cabinet. *Id.* at 143, 174. Ms. Clark wanted to wake Ms. Buckert up, but Mr. Conn wanted to let her rest because she was sick. *Id.* at 144. Ms. Clark left. *Id.*

At about 1 or 1:30 p.m.—about an hour to an hour and a half after Ms. Clark left—Mr. Conn became concerned because Ms. Clark had been concerned and because Ms. Buckert had been sleeping for about eleven hours at that point. *Id.* at 144, 147-48. He tried to wake Ms. Buckert up and, after a little while, was able to wake her up. *Id.* at 144. She was responsive and answered his questions. *Id.* at 148. She asked where her patch was, and he told her. *Id.* She said that she had a bad headache and did not feel good and wanted to go back to sleep. *Id.* at 144. He said that "[s]he took a couple bites of some food, took a couple of puffs off a cigarette[,] . . . took a couple Valiums and went back to sleep[.]" *Id.*

After Ms. Buckert went back to sleep, Mr. Conn continued to check on her every twenty to thirty minutes. *Id.* at 148. Three friends of hers came by in the early evening, between 5 and 7 p.m, to buy methamphetamines from her. *Id.* at 149-51. He said he could get some for them, took their money, and left the residence, asking them to keep an eye on Ms. Buckert. *Id.* at 149-52. Outside, he saw one of his neighbors, Kurt Norman, and also asked him to keep an eye on the residence and Ms. Buckert. *Id.* at 152. He left on foot. *Id.* at 153.

Later in the evening, when Mr. Conn was at Mr. Page's house, Mr. Conn received a call from Mr. Norman, telling him that Ms. Buckert did not look good and Mr. Conn should come home. *Id.* at 156. Mr. Conn took Mr. Page's truck and drove home. *Id.* He said that when he got there "everybody was freaking out saying, you know, she's really cold and, you know, I think she's passed away, she doesn't look good." *Id.* He confirmed that she was breathing "very low" and checked that she had a heartbeat, although it was "really slow." *Id.* He and one of Ms. Buckert's friends loaded her into Mr. Page's truck, and Mr. Conn called Mr. Page to tell him they needed to take her to the hospital. *Id.* Mr. Page's wife, Belinda, answered the phone and told him that Ms. Buckert and Mr. Page had some of the same medical conditions, so Mr. Conn should bring Ms. Buckert to their house. *Id.* Mr. Conn did not take Ms. Buckert directly to the hospital because he did not want her to get into trouble for taking illegal drugs. *Id.* at 157, 160.

Mr. Conn drove Ms. Buckert to Mr. Page's house, and he and Mr. Page carried her from the truck into the house and put her on the couch. *Id.* at 156-57. Mrs. Page put some water on Ms. Buckert's lips and tongue, and Ms. Buckert responded by moving her tongue and opening her eyes, which were rolling. *Id.* at 157, 162. Mr. Page and his wife said that Ms. Buckert might have overdosed, but that she would be fine. *Id.* at 157. Mr. Page and Mr. Conn both gave Ms. Buckert "mouth-to-mouth" because she was not breathing well. *Id.* at 162. Mr. Conn left sometime between 11 p.m. and 1 a.m. to try to find glycerin pills and oxygen to help her breathing. *Id.* at 157-58, 163. He could not find any and called Mr. Page's house from the truck, only to be told that Ms. Buckert had been taken to the hospital by ambulance and the police were at Mr. Page's house. *Id.* at 158. The Pages' son, Scott, had called 911. *Id.* at 158-59.

Mr. Conn said that he went to Mr. Page's house and told a police officer there that Ms. Buckert had taken Lortabs, Valium, and a "morphine patch thing." *Id.* at 165. He then went by his residence to pick up the patch and, when he arrived at the hospital, gave it to the same police officer, who was also at the hospital by that time. *Id.* at 165-66. Officer Jason Wright testified that Mr. Conn spoke to him at Mr. Page's house about the patch and later gave it to him at the hospital. *Id.* at 287-88. Detective David A. Thompson testified that the patch, still taped to the package of guitar strings, was sent to the crime lab, *id.* at 40-44,

and Ella Kubicz, Ph.D., a chemist at the crime lab, testified that she tested the patch and found it to contain fentanyl, *id.* at 269, 272-75.

Lisa Mondragon substantially corroborated Mr. Conn's testimony about the drug transaction at the Saddle Lite Motel on November 7, 2007. She said that she saw Ms. Buckert at the motel that day. *Id.* at 86-90. The other people there were Christy and Warren Harlow, Mr. Page, and Eric Conn. *Id.* at 90-91. Ms. Mondragon said that Ms. Buckert told Mr. Page that she would leave him the money, she threw $60 on the bed (a $50 bill and a $10 bill), and she and Mr. Conn left the motel. *Id.* at 93-94. Mr. Page picked up the money, putting $50 back on the bed and $10 in his pocket. *Id.* at 95. About five minutes later, a lady came into the room through the open door and handed Mr. Page a foiled envelope, he handed her the $50, they had a brief discussion about maintenance on her apartment, and then she left. *Id.* at 95-97. Mr. Page put the package on the bed. *Id.* at 98. A few minutes later, Ms. Buckert and Mr. Conn returned. *Id.* at 99-100. Ms. Buckert picked the package up off the bed while Mr. Conn waited at the door, said "thanks" to Mr. Page, and she and Mr. Conn left. *Id.* Ms. Mondragon later learned that the "lady" was Jhalia Hopkins. *Id.* at 104-05.

Jhalia Hopkins, Mr. Page's co-defendant, testified that she moved to Rock Springs in 2005 to live with her mother. *Id.* at 211-12. She said that her mother died in September 2007 from cancer, the treatment of which included several pain medications—in particular, fentanyl transdermal patches. *Id.* at 212-13.

Ms. Hopkins testified that on November 7, 2007, she received a call from Christy Harlow, asking her to bring a fentanyl patch to the motel. *Id.* at 214-15. Ms. Hopkins said that she and her mother had sold these patches to Mrs. Harlow before. *Id.* at 215. Ms. Hopkins immediately went to Room 11 at the Saddle Lite Motel. *Id.* at 215-16. When she arrived, she saw Mr. Page, Christy and Warren Harlow, Lisa Mondragon, Eric Conn, Stephanie Buckert, and another woman she could not identify. *Id.* at 216-18. Ms. Hopkins spoke briefly with Mr. Page and Warren Harlow about a job for her fiance and maintenance on her apartment, but she made eye contact with Christy Harlow, who said, "Come on[,]" and they went into the bathroom. *Id.* at 218-20. Mrs. Harlow gave Ms. Hopkins $60 (three $20 bills), and Ms. Hopkins gave Mrs. Harlow the patch and left. *Id.* at 219, 222-23. On one or two prior occasions when she had sold fentanyl patches to Mrs. Harlow and Mr. Page was present, Ms. Hopkins gave Mrs. Harlow the patch, who then gave it to Mr. Page. *Id.* at 220-21. Other fentanyl patches like the one she sold to Christy Harlow on November 7, 2007, were found when police later searched Ms. Hopkins' residence. *Id.* at 221.

Mr. Page also testified. He said that he had two prior felony convictions, *id.* at 316-17, and that he had illegally used fentanyl patches before, for the pain from his several medical conditions, *id.* at 319-20. He admitted that he was in his sister's motel room, Room 11 at the Saddle Lite Motel, on "the date in question[,]" November 7, 2007. *Id.* at 321, 323. He admitted that he and

-10-

Mr. Conn had been doing lawn care work together that day and that they drove together in his truck to pick up Ms. Buckert on the way to the motel. *Id.* at 323-25. He said that they saw her in a brown truck, talking with some man he did not know. *Id.* at 324-25. They stopped, and Mr. Conn talked to Ms. Buckert, but Mr. Page claimed that Ms. Buckert continued on with the man in the brown truck, while he and Mr. Conn drove to the motel. *Id.* at 324-25. Mr. Page said that he got out at the motel, but Mr. Conn left again to find Ms. Buckert. *Id.* at 325-26. Mr. Page said that Christy and Warren Harlow were in the motel room with Lisa Mondragon when he first arrived, and Mr. Conn and Ms. Buckert arrived a few minutes later. *Id.* at 326-27. He said that Mr. Conn had been asking him for two or three days if he could get Mr. Conn some pain medication, and asked him again at the motel room. *Id.* at 327-28. Mr. Page told Mr. Conn that he did not have any. *Id.* He said that he did not know what else happened because he had gotten four Valiums from Ms. Buckert when they saw her earlier, and he passed out on the bed. *Id.* at 329. He stated that he woke up later and saw Jhalia Hopkins in the room, but he denied talking to her. *Id.* at 329-30. He said, however, that he "thought at one point . . . that there was a patch on the bed." *Id.* at 330. He denied ever distributing a fentanyl patch to anybody, including on November 7, 2007, at the Saddle Lite Motel, and denied leaving the room with a $10 bill in his pocket. *Id.* at 331-32.

After the close of all of the evidence and closing arguments, the jury returned a verdict of guilty on Count One of the indictment: "conspiracy to possess with intent to distribute and to distribute fentanyl[.]" Aplt. App. at 440; *see also id.* at 7-8. In a special interrogatory to Count One, the jury found proof beyond a reasonable doubt that the use of the fentanyl transdermal patch resulted in the death of Stephanie Buckert, and that the patch that resulted in her death was distributed to her during and in furtherance of the conspiracy. *Id.* at 440-41. The jury found Mr. Page not guilty on Count Two of the indictment: "distribution of fentanyl[.]" *Id.* at 441, *see also id.* at 8.

* * *

Before us, Mr. Page does not challenge the sufficiency of the evidence as it relates to the jury's finding that the victim, Stephanie Buckert, died from acute fentanyl toxicity, and we need not review that finding. Rather, Mr. Page contends that there is insufficient evidence in the record to show that there was an agreement between himself, Ms. Hopkins, and some other person to possess, with intent to distribute, the fentanyl patch that resulted in the death of Stephanie Buckert. Aplt. Opening Br. at 7. He argues that, of all the witnesses, the testimony of Jhalia Hopkins was "[t]he most reliable" because her "truthful testimony was a condition of her plea agreement." *Id.* He points out that Ms. Hopkins testified that she saw Mr. Page at his sister's motel room, but said that her drug transaction was with Christy Harlow, not Mr. Page. *Id.* at 8. He

-12-

argues that "[a]t best, all a reasonable jury could have concluded beyond a reasonable doubt, in light of all the other testimony, . . . , is that Mr. Page knew that his sister . . . could provide the drugs Ms. Buckert . . . wanted and that money changed hands." *Id.* at 9; *see also* Aplt. Reply Br. at 1 ("At most, what the Government proved at trial, . . ., was that Page put a willing buyer in contact with a willing seller.").

In this, as in all cases, "[w]e review the record for sufficiency of the evidence de novo." *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997). Our review is "highly deferential." *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008) (quotation omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[W]e evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *United States v. Johnson*, 130 F.3d 1420, 1428 (10th Cir. 1997) (quotations and alteration omitted). "An appellate court may not decide the credibility of witnesses as that is the exclusive task of the fact trier." *United States v. Youngpeter*, 986 F.2d 349, 352 (10th Cir. 1993). If there is conflicting testimony, "it is for the jury to decide which witnesses to believe and which not." *Id.* at 352-53. In addition, we need not consider whether the jury acted rationally in convicting Mr. Page on one count while acquitting him

-13-

on another. *United States v. Hill*, 971 F.2d 1461, 1469 (10th Cir. 1992). Our review is limited to determining "whether the evidence adduced at trial could support *any* rational determination of guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Powell*, 469 U.S. 57, 67 (1984)). This review is "independent of the jury's determination that the evidence on another count was insufficient." *Id.* (quoting *Powell*, 469 U.S. at 67) (emphasis in *Hill* omitted).

"To find a defendant guilty of conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846, the jury must find, beyond a reasonable doubt, (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997). "It is permissible for the jury to infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose." *Id.* (quotation omitted). "[A] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role." *United States v. Savaiano*, 843 F.2d 1280, 1294 (10th Cir. 1988). "A defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." *United States v. Ivy*, 83 F.3d 1266, 1286 (10th Cir. 1996) (quotation omitted).

Factors the jury, or a court reviewing a jury's verdict, may consider in drawing the inference of a conspiracy include, but are not limited to: (1) a defendant's presence at the crime scene; (2) a defendant's association with co-conspirators; (3) evidence of conflicting stories; (4) active attempts to divert officers' attention from a stopped vehicle; (5) participation in drug transactions; or (6) knowledge of and control over drugs. . . . Any single factor, standing alone, may be insufficient to support an inference of conspiracy. . . . A direct correlation exists, however, between the number of circumstantial facts and the existence of a conspiracy.

*United States v. Delgado-Uribe*, 363 F.3d 1077, 1083 (10th Cir. 2004).

In light of these principles, the evidence was clearly sufficient to support Mr. Page's conspiracy conviction, and Mr. Page's selective presentation of the evidence in his briefs on appeal is unavailing. It is not the province of this court to compare the credibility of Jhalia Hopkins to that of any other witness, and it is apparent that the jury credited the testimony of Eric Conn and Lisa Mondragon and did not believe Ms. Hopkins to the extent that her story conflicted with theirs.

To summarize: Mr. Conn testified that Ms. Buckert asked Mr. Page if he had any pain medication, and Mr. Page answered in the affirmative and immediately took her to Christy Harlow's motel room to get drugs. Mr. Conn said that both Mrs. Harlow and Mr. Page made phone calls in response to the request for drugs, and Mr. Page told Ms. Buckert the price. Mr. Conn said that he and Ms. Buckert left the motel only briefly and that, by the time they returned, there was a square package on the bed. Mr. Conn said that Ms. Buckert paid Mr. Page for the drugs. Mr. Conn also said that Ms. Buckert identified the drugs as a

fentanyl patch and that he later gave the patch to the police. A chemist from the crime lab testified that the patch was a fentanyl patch, and a forensic pathologist testified that fentanyl was the cause of Ms. Buckert's death. Ms. Mondragon substantially corroborated Mr. Conn's version of the drug transaction and Mr. Page's role in it, testifying that Ms. Buckert paid Mr. Page $60 and Mr. Page pocketed $10. Jhalia Hopkins' testimony confirmed that she took a fentanyl patch to the motel within a few minutes of a call from Christy Harlow. It is irrelevant that Ms. Hopkins said that Ms. Buckert paid Mrs. Harlow, not Mr. Page, and that she paid with $20 bills, not a $50 bill and a $10 bill, because the jury was free to decide which witness to believe.

Based on the evidence presented at trial, a rational factfinder could reasonably have inferred that Mr. Page knowingly and voluntarily participated in a conspiracy to possess fentanyl with intent to distribute. It was not necessary for the government to produce direct evidence of an agreement between Mr. Page and Jhalia Hopkins to violate the law (and not necessary to show an agreement between three persons, as Mr. Page argues). It is sufficient that the circumstantial evidence of the actions of Mr. Page and Jhalia Hopkins indicates "concert of action for the accomplishment of a common purpose." *See Carter*, 130 F.3d at 1439 (quotation omitted). On the record before us, the jury was plainly free to

reach such a conclusion in this case.

*Affirmed.*

Entered for the Court


Neil M. Gorsuch
Circuit Judge