**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 14, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEONARD GEORGE PAGE,

    Defendant – Appellant.

No. 12-8002
(D.C. No. 2:10-CV-00046-ABJ and
2:08-CR-00006-ABJ-1)
(D. Wyo.)

---

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]

---

Before **LUCERO**, **O'BRIEN,** and **MATHESON**, Circuit Judges.

---

Leonard George Page, a federal prisoner proceeding pro se,[1] seeks a certificate of

appealability ("COA") to challenge the district court's denial of his 28 U.S.C. § 2255

petition to vacate, set aside, or correct his sentence. *See* 28 U.S.C. § 2253(c)(1)(B)

---

[*]This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]Because Mr. Page is proceeding pro se, we construe his pleadings liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009) ("[W]e must construe a [pro se litigant's] arguments liberally; this rule of liberal construction stops, however, at the point at which we begin to serve as his advocate.").

(requiring a COA to appeal an order denying a § 2255 petition).  He also seeks leave to proceed *in forma pauperis*.  We deny both requests and dismiss this matter.

## I.     BACKGROUND

After a jury trial in the District of Wyoming, Mr. Page was convicted of one count of conspiracy to possess with intent to distribute and conspiracy to distribute fentanyl, resulting in death, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C).  The charge and conviction arose out a drug transaction involving a fentanyl patch. The transaction occurred in a Wyoming motel room on November 7, 2007, after which Stephanie Buckert died of acute fentanyl toxicity.

### A. *Trial Testimony*

At trial, numerous witnesses offered testimony about the drug transaction.

#### 1.  *Eric Conn's Testimony*

Eric Conn, Ms. Buckert's common-law husband, testified as follows:  While he, Ms. Buckert, and Mr. Page were in Mr. Page's pickup truck, Ms. Buckert asked if Mr. Page had any pain medication or narcotics.  Mr. Page responded, "you know, sure," and that they should go "down to Christy's." *United States v. Page*, 317 Fed. Appx. 806, 807 (10th Cir. 2009) (unpublished).  Christy is Christy Harlow, Mr. Page's sister.  The three went to a motel where Ms. Harlow was staying.   Ms. Harlow was in the motel room with her husband, Warren Harlow, and her friend, Lisa Mondragon.

After Mr. Page asked Ms. Harlow where he could get pain medications, she made some calls on her cell phone.  Mr. Page then borrowed Ms. Harlow's phone to make

more calls.  Mr. Page told Ms. Buckert that the pain medication would cost $60.  Ms. Buckert gave Mr. Page $60 in cash.

Mr. Conn and Ms. Buckert left the motel but returned shortly thereafter.  Mr. Conn saw a folded, square paper or package on the bed.  Ms. Buckert picked up the package and put it in her purse.  Then Mr. Conn, Ms. Buckert, and Mr. Page left in Mr. Page's truck.  While in the truck, Mr. Page told Ms. Buckert that when she took the patch out of its packaging, she could heat it with a hair dryer to make it release the drugs faster.

The next day, Mr. Conn kept a close eye on Ms. Buckert because she had recently been sick and in the hospital.  At one point, a friend of Ms. Buckert's stopped by Mr. Conn's residence and noticed that Ms. Buckert was sweating.  The friend and Mr. Conn took the blankets off Ms. Buckert and removed her shirt.  They noticed the patch on her skin under her left breast.[2]

### 2. *Ms. Mondragon's Testimony*

Ms. Mondragon's testimony about the drug transaction was similar to Mr. Conn's.  She recounted that she was in the motel room with Ms. Harlow, Mr. Harlow, Ms. Buckert, Mr. Conn, and Mr. Page.  Ms. Buckert told Mr. Page that she would leave him the money and threw $60 on the bed (a $50 and $10 bill).  Ms. Buckert and Mr. Conn then left the motel.  Mr. Page picked up the money, putting the $50 bill back on the bed and the $10 bill in his pocket.  About five minutes later, a woman, who Ms. Mondragon

---

[2] "Th[is] was the first time that Mr. Conn . . . knew that Ms. Buckert had put the patch on . . . ." *Page*, 317 Fed. Appx. at 808.

later learned was Jhalia Hopkins, entered the room and handed Mr. Page a foiled envelope. Mr. Page handed Ms. Hopkins the $50 bill, and after a brief discussion about maintenance for her apartment, Ms. Hopkins left the room. Mr. Page then put the package on the bed. A few minutes later, Ms. Buckert and Mr. Conn returned. Ms. Buckert picked up the package, said "thanks" to Mr. Page, and then left with Mr. Conn.

### 3. *Ms. Hopkins's Testimony*

Ms. Hopkins, who was a codefendant in the criminal case, testified that she had sold fentanyl patches to Ms. Harlow on previous occasions. Mr. Page was present during some of these transactions. When he was present, Ms. Hopkins sometimes gave the patch to Ms. Harlow, who then gave it to Mr. Page.

Ms. Hopkins provided a different account of the transaction in the motel room. On November 7, 2007, Ms. Harlow called Ms. Hopkins and asked her to bring a fentanyl patch to the motel. Ms. Hopkins delivered it to the motel room, where she saw Mr. Page, Ms. Harlow, Mr. Harlow, Ms. Mondragon, Mr. Conn, Ms. Buckert, and another woman she did not know. Ms. Hopkins spoke briefly with Mr. Page and Mr. Harlow about a job for her fiancé and maintenance on her apartment. She then made eye contact with Ms. Harlow, who said, "Come on," and then went with her into the bathroom. *Page*, 317 Fed. Appx. at 810. Ms. Harlow paid Ms. Hopkins $60 (three $20 bills) in exchange for the patch, after which Ms. Hopkins left the motel room.

### 4. *Mr. Page's Testimony*

-4-

Mr. Page also testified. He admitted to using fentanyl patches in the past for his medical conditions.

Mr. Page said he was in the motel room on November 7, 2007, but he claims that he entered the room alone and that Mr. Conn and Ms. Buckert came to the room later. According to Mr. Page, Mr. Conn had been asking him for a few days if he could get him pain medication. He asked again in the motel room. Mr. Page said that he did not have any.

Mr. Page testified that he did not know what else happened in the motel room because he passed out on the bed after taking four Valiums that he had received earlier that day from Ms. Buckert. When he woke up, he saw Ms. Hopkins in the room. He did not talk to Ms. Hopkins but "thought at one point . . . that there was a patch on the bed." *Page*, 317 Fed. Appx. at 810-11. He denied ever distributing a fentanyl patch to anyone and stated that he did not leave the motel room with a $10 bill in his pocket.

**B.** *Ms. Harlow's Letters*

Although Ms. Harlow did not testify at trial, she sent two letters to Mr. Page while he was in prison. In the first, Ms. Harlow expressed her desire to have testified at Mr. Page's trial. Ms. Harlow stated that she was "very sorry[.] I wish they would have called us to the stand[;] cause then you wouldn't be in there & the [Government] knew it so made sure we weren't called. They knew I would tell the truth & it would've set you free, pissess me off." ROA, Vol. 1, at 83.

-5-

She then provided her own account of the events on November 7, 2007. She explained that Mr. Page, his son, and Mr. Conn arrived together and were all drunk. Ms. Buckert arrived later. Ms. Hopkins then called the motel room phone and asked "if anyone wanted weed." *Id.* at 85. Ms. Harlow asked if anyone wanted any, and "[Ms. Buckert] hollered out for [Ms. Hopkins] to bring a patch." *Id.* Ms. Buckert asked how much the patch would cost, and Ms. Harlow told her $60. Ms. Buckert and Mr. Conn then left to go to the store. While they were gone, Mr. Page "passed out." *Id.* Without saying when Ms. Buckert came back to the motel, Ms. Harlow said that Ms. Buckert "put 3 twenties at the edge of the bed opposite from where [Mr. Page was]." *Id.*

Ms. Harlow left to buy candy at a nearby convenience store. On her way back, she saw Ms. Hopkins driving toward the motel. When Ms. Harlow returned to the motel room, she told Mr. Harlow that she was going downstairs to do laundry and then left the room. When she returned, Ms. Hopkins was gone. Mr. Harlow told her Ms. Hopkins had been in a hurry and tried to give him the patch. Because Mr. Harlow had spackling on his hands, he could not take it. Ms. Hopkins put the patch on the bed, took the money, and left. Ms. Harlow said that Ms. Mondragon was outside when this occurred.

When Ms. Buckert and Mr. Conn returned, Ms. Buckert "saw the patch & headed to the bathroom." *Id.* at 86. Ms. Harlow wrote that Mr. Conn then put the patch on Ms. Buckert's right shoulder. Mr. Page woke up after these events transpired. "That's how it [h]appened[.] I swear on Mom, Dad's & Stevie's graves." *Id.*

Ms. Harlow's second letter was much less cordial and was strewn with expletives directed at Mr. Page. It said, in relevant part:

> Your attorney nor [the Government] put me on the stand because I told your attorney if he put me on the stand I would blow the [Government's] case out of the water. Your attorney told the [Government] what I said & they told him not to put me on, "there."

*Id.* at 88.

## C. *Procedural History*

The jury found Mr. Page guilty of conspiracy to possess with intent to distribute and conspiracy to distribute fentanyl, resulting in death, but found him not guilty of distributing fentanyl. The district court sentenced him to life in prison.

Mr. Page appealed his conviction, arguing that there was insufficient evidence to show that he was involved in a conspiracy to possess, with intent to distribute, fentanyl patches. We rejected this argument. *Page*, 317 Fed. Appx. at 813

Mr. Page filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, arguing that there was insufficient evidence that he was involved in a conspiracy, that his attorney provided ineffective assistance of counsel by failing to interview Ms. Harlow and elicit her testimony at trial, and that his life sentence is void for vagueness.

The district court rejected all of Mr. Page's claims, denied his motion, and denied a COA. Mr. Page filed a motion to alter or amend the district court's judgment under Rule 59(e) of the Federal Rules of Civil Procedure. He challenged the district court's

conclusion on ineffective assistance of counsel and the district court's authority to deny a COA sua sponte. The district court denied this motion.

## II. DISCUSSION

Mr. Page now requests that we grant a COA on his ineffective assistance of counsel claim. A COA is a jurisdictional prerequisite for appeal from the district court's dismissal of his § 2255 petition. *See* 28 U.S.C. § 2253(c)(1)(B); *United States v. Gonzalez*, 596 F.3d 1228, 1241 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 172 (2010). To obtain a COA, Mr. Page must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). A prisoner may make a "substantial showing of the denial of a constitutional right" by "showing that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 484 (quotations omitted).

Mr. Page makes two arguments in his application for a COA. First, he argues, as he did at the district court, that his counsel was ineffective for failing to interview Ms. Harlow and to call her as a witness at trial.[3] Second, he argues that the district court cannot deny a COA sua sponte.

---

[3]Mr. Page also argues that the district court abused its discretion in denying his Rule 59(e) motion to alter or amend. Because his argument on this issue rests on whether

Continued . . .

## A. *Ineffective Assistance of Counsel*

Mr. Page argues that his trial counsel was ineffective for failing to interview Ms. Harlow and to call her to testify at trial. At the district court, he contended that the first letter from Ms. Harlow indicated that she was willing to testify and that her testimony would have been exculpatory.

The district court concluded that Ms. Harlow's second letter showed that Mr. Page's attorney must have interviewed Ms. Harlow. The district court also concluded that his attorney's decision not to call Ms. Harlow as a witness at trial did not fall below an objective standard of reasonableness and that his assistance was thus not ineffective. The court explained that Ms. Harlow's testimony would likely have been more harmful than beneficial because inconsistencies in her testimony could have been exploited by the government and issues with her demeanor might have rendered her less credible.

To establish a claim of ineffective assistance of counsel, a petitioner must show both (1) constitutionally deficient performance and (2) resulting prejudice by demonstrating a reasonable probability that, but for counsel's unprofessional errors, the result of the case would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the applicant is unable to show either "deficient performance" or "sufficient prejudice," the ineffective assistance claim necessarily fails. *Hooks v. Workman*, 606 F.3d 715, 724 (10th Cir. 2010).

his counsel was ineffective in deciding not to call Ms. Harlow to testify, we do not address it separately.

"[O]ur review of counsel's performance under the first prong of *Strickland* is a highly deferential one." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (quotations omitted), *cert. denied*, 132 S. Ct. 763 (2011). "[W]e indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and presume that counsel's conduct is sound strategy. *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quotations omitted), *cert. denied*, 132 S. Ct. 292 (2011). "To be deficient, the performance must be outside the wide range of professionally competent assistance. . . . [I]t must have been completely unreasonable, not merely wrong." *Hooks*, 606 F.3d at 723 (citation omitted) (quotations omitted).

Mr. Page's only contention in his application for a COA is that his counsel was ineffective for failing to interview Ms. Harlow and to call her to testify at trial. As the district court explained, Ms. Harlow's second letter indicates that Mr. Page's attorney interviewed Ms. Harlow. Mr. Page does not challenge this conclusion. Therefore, the only issue is whether his attorney's failure to call Ms. Harlow to testify constitutes ineffective assistance.

The decision whether to call a witness to testify at trial is within the sole discretion of trial counsel. *DeLozier v. Sirmons*, 531 F.3d 1306, 1324 (10th Cir. 2008). The fact that many attorneys might have employed a different strategy and chosen to call a witness to testify does not render an attorney's assistance constitutionally deficient. *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular

client in the same way."). As stated above, for an attorney's performance to be deficient, "it must be[] completely unreasonable, not merely wrong." *Hooks*, 606 F.3d at 723.

It is unlikely that Ms. Harlow's testimony would have been credible. *See Bunton v. Atherton*, 613 F.3d 973, 983 (10th Cir. 2010), *cert. denied*, 131 S. Ct. 1783 (2011) (noting that prejudice element would not be satisfied because, even if witness testified, it was unclear if she would have been a credible witness); *DeLozier*, 531 F.3d at 1325 (decision not to call witness was not unreasonable because witness made incriminating statements in earlier interview and there was strong possibility that his testimony would not conform to his earlier statements). Mr. Conn's and Ms. Hopkins's testimony place Ms. Harlow in the middle of the drug transaction. Moreover, according to Ms. Harlow's description of the events, she was not present when the transaction occurred, meaning her testimony would have carried less weight or may in part have been inadmissible.

Our review of the record shows that counsel did not perform deficiently under *Strickland* when he did not call Ms. Harlow to testify at Mr. Page's trial. We conclude that reasonable jurists could not debate the correctness of the district court's decision on Mr. Page's ineffective assistance of counsel claim. We therefore deny COA on this issue.

### B. *Denying COA Sua Sponte*

Mr. Page also argues that the district court erred when it denied a COA sua sponte. Rule 11(a) of the Rules Governing § 2255 Proceedings states that "[t]he district court *must* issue or deny a [COA] when it enters a final order adverse to the applicant."

-11-

(Emphasis added). "If the court denies a [COA], a party may . . . seek a [COA] from the court of appeals under Federal Rule of Appellate Procedure 22." *Id.* Therefore, it was proper for the district court to deny a COA sua sponte. *See Haynes v. Quarterman*, 526 F.3d 189, 193 (5th Cir. 2008) ("We have clearly held that the district court's denial of a COA *sua sponte* is perfectly lawful" (quotations omitted)).

## III.    CONCLUSION

We reject Mr. Page's application for a COA and dismiss this matter. We also deny his request to proceed *in forma pauperis*.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge